[No. S029985. July 25, 1994.]

JAMES M. TURNER, Plaintiff and Appellant, v.
ANHEUSER-BUSCH, INC., Defendant and Respondent.

COUNSEL

Timothy L. Taggart for Plaintiff and Appellant.

Joseph Posner and William C. Quackenbush as Amici Curiae on behalf of Plaintiff and Appellant.

Ballard, Rosenberg & Golper, John B. Golper, Jeffrey P. Fuchsman and John J. Manier for Defendant and Respondent.

Paul, Hastings, Janofsky & Walker, Paul Grossman, Paul W. Cane, Jr., Horvitz & Levy, Ellis J. Horvitz and Daniel J. Gonzalez as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

LUCAS, C. J.—Plaintiff James M. Turner asserts he was forced by his employer, defendant Anheuser Busch, Inc. (ABI), to quit his job after he complained of ABI's alleged illegal activity. Although ABI prevailed on summary judgment in the trial court, Turner persuaded the Court of Appeal to reinstate his claim. We now consider the elements of a cause of action for constructive wrongful discharge in violation of fundamental public policy. Applying those elements, we discern no material issue of fact and no legal foundation for Turner's case. We therefore reverse the judgment of the Court of Appeal and direct summary judgment in favor of ABI.

### I. FACTS AND PROCEDURAL HISTORY

Turner worked at ABI's Los Angeles brewery as an industrial relations manager for approximately six years, until his voluntary resignation in 1981. In January 1984, Turner returned to work for ABI at its wholesale operations division in Riverside.

Turner's initial position at the Riverside division was "branch off-premises coordinator" in the sales department. As such, he was responsible for coordinating sales activities with retailers who sold ABI products off-sale, i.e., for consumption away from the retailers' premises. Turner's immediate supervisor was William Schmitt. Schmitt's supervisor was George Liakos.

In May 1985, Turner was reassigned to the position of "assistant supervisor route sales." He retained the same salary and level of responsibility. In his new position, Turner no longer reported to Schmitt. In January 1986, Schmitt was transferred to St. Louis, Missouri.

With one exception, Turner received overall "good" ratings on written performance evaluations between June 1984 and November 1987. (He received a "needs improvement" rating in December 1984.) On his December

28, 1988, evaluation, however, Turner received a "needs improvement" rating. On that day, Turner met with ABI supervisors who, citing specific incidents, alleged that Turner's job performance had deteriorated. Turner denied that charge and criticized the supervisors' decision to wait until the meeting to complain of the particular incidents, rather than discussing them at the time of their occurrence.

On January 3, 1989, Turner tendered a letter of resignation to ABI, effective February 1, 1989. After his departure, Turner filed suit against ABI and certain individuals, alleging causes of action for age discrimination, constructive wrongful discharge in violation of public policy, breach of contract, and both intentional and negligent infliction of emotional distress.

The individual defendants were dismissed in various pretrial proceedings. Turner's emotional distress claims were dismissed on ABI's motion for judgment on the pleadings; he voluntarily dismissed his claim for age discrimination. ABI then obtained summary judgment on the breach of contract and public policy claims.

The Court of Appeal affirmed the summary judgment as to the contract claim, but reversed on the public policy claim. It held that the "cumulative effect" of the "long list of alleged actions [by ABI] and [workplace] conditions" established a triable case of constructive wrongful discharge in violation of public policy. We granted ABI's petition for review.

## II. DISCUSSION

### A. *The Governing Law*

Employment relationships are generally terminated by resignation or discharge. (Lab. Code, § 2922.) An employee voluntarily severs the relationship by resignation; the employer does so by actual discharge. (*Ibid.*)

Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted "end runs" around wrongful discharge and other claims requiring employer-initiated terminations of employment.

### (1) *Constructive Discharge*

■ Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, "I

quit," the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. (*Zilmer* v. *Carnation Co.* (1989) 215 Cal.App.3d 29, 38-39 [263 Cal.Rptr. 422] [hereafter *Zilmer*].)

We have not previously addressed what an employee must prove to establish a constructive discharge. The Courts of Appeal have devised and applied the following test for constructive discharge: "[A]n employee who is forced to resign due to actions and conditions so intolerable or aggravated at the time of his resignation that a reasonable person in the employee's position would have resigned, and whose employer had actual or constructive knowledge of the intolerable actions and conditions and of their impact upon the employee and could have remedied the situation, but did not, is constructively discharged." (*Zilmer, supra,* 215 Cal.App.3d at p. 38; see also *Brady* v. *Elixir Industries* (1987) 196 Cal.App.3d 1299, 1306 [242 Cal.Rptr. 324] [hereafter *Brady*].)

Three areas of inquiry are suggested by the proffered test: (1) what kinds of actions or conditions are sufficient to convert what is ostensibly a voluntary quit into a discharge; (2) whether the impact of those actions and conditions is measured by a subjective (impact on this particular employee) test or an objective (impact on a hypothetical reasonable employee) test; and (3) what level of employer knowledge or intent regarding those actions or conditions should be required to achieve a discharge. We will consider these questions in light of the case law concerning constructive discharge.

The doctrine of constructive discharge was first recognized in federal cases brought under the National Labor Relations Act (NLRA). Under section 8(a)(3) of the NLRA, it is "an unfair labor practice for an employer . . . by discrimination . . . to encourage or discourage membership in any labor organization . . . ." (29 U.S.C. § 158(a)(3).) Approving decisions of the National Labor Relations Board and lower courts, the United States Supreme Court has held that "an employer violates [§ 8(a)(3)] not only when, for the purpose of discouraging union activity, it directly dismisses an employee, but also when it *purposefully creates working conditions so intolerable that the employee has no option but to resign—a so-called 'constructive discharge.'*" (*Sure-Tan, Inc.* v. *NLRB* (1984) 467 U.S. 883, 894 [81 L.Ed.2d 732, 744, 104 S.Ct. 2803], italics added.)

The federal courts have also applied constructive discharge in employment discrimination cases under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e) and the Age Discrimination in Employment Act of 1967 (29

U.S.C. §§ 621-634; ADEA). Some federal cases have required "deliberate" conduct by an employer creating conditions so aggravated or intolerable that a reasonable person in the employee's position would have felt compelled to resign.[1] The federal Court of Appeals for the Fourth Circuit has gone further, requiring proof of an employer's express intent to cause an employee to resign. (*Bristow* v. *Daily Press, Inc.* (4th Cir. 1985) 770 F.2d 1251, 1255, cert. den. (1986) 475 U.S. 1082 [89 L.Ed.2d 718, 106 S.Ct. 1461].)

In contrast, the Ninth Circuit's formulation of constructive discharge makes no reference to employer knowledge or intent, but provides instead that "[a] constructive discharge occurs when, looking at the totality of circumstances, 'a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions.' " (*Watson* v. *Nationwide Ins. Co.* (9th Cir. 1987) 823 F.2d 360, 361, quoting *Satterwhite* v. *Smith* (9th Cir. 1984) 744 F.2d 1380, 1381.)[2] State court cases in discrimination and wrongful discharge contexts have generally followed the lead of the federal courts. (See, e.g., *Slack* v. *Kanawha County Housing* [hereafter *Slack*] (1992) 188 W.Va. 155 [423 S.E.2d 547] [collecting and analyzing state and federal cases]; *Beye* v. *Bureau of National Affairs* [hereafter *Beye*] (1984) 59 Md.App. 642 [477 A.2d 1197], cert. den. (1984) 301 Md. 639 [484 A.2d 274].)

### a.  *Intolerable Conditions*

■  Under the cases, an employee cannot simply "quit and sue," claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee.

---

[1]See, e.g., *Stetson* v. *Nynex Service Company* (2d Cir. 1993) 995 F.2d 355, 361 (employer "deliberately created working conditions that were ' "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" ' "); *McKethan* v. *Texas Farm Bureau* (5th Cir. 1993) 996 F.2d 734, 740 (employer " 'deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation' "); *Irving* v. *Dubuque Packing Co.* (10th Cir. 1982) 689 F.2d 170, 172 (employer "deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit"); *Johnson* v. *Bunny Bread Co.* (8th Cir. 1981) 646 F.2d 1250, 1256 (employer " 'deliberately renders the employee's working conditions intolerable and thus forces [the employee] to quit' ").

[2]The federal ADEA cases are collected in Annotation, Circumstances Which Warrant Finding of Constructive Discharge Under Age Discrimination in Employment Act (1989) 93 A.L.R.Fed. 10.

" 'An employee may not be unreasonably sensitive to his [or her] working environment . . . . Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress.' " (*Goldsmith* v. *Mayor and City of Baltimore* (4th Cir. 1993) 987 F.2d 1064, 1072.)

In order to amount to a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable.[3] In general, "[s]ingle, trivial, or isolated acts of [misconduct] are insufficient" to support a constructive discharge claim. (Silver, Public Employee Discharge and Discipline (1989) § 1.5, p. 1-13.) Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge.[4]

"There appears to be no disagreement [in the cases] that one of the essential elements of any constructive discharge claim is that the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions." (*Slack, supra*, 423 S.E.2d at p. 556.)

Various terms such as "intolerable" or "aggravated" have been used to describe the subnormal character of the working conditions required to establish constructive discharge. (*Slack, supra*, 423 S.E.2d at p. 556; see also *Zilmer, supra*, 215 Cal.App.3d at p. 38; *Brady, supra*, 196 Cal.App.3d at p. 1306.) The essence of the test is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position " ' "would have felt compelled to resign." ' " (*Slack, supra*, 423 S.E.2d at p. 556, quoting *Calhoun* v. *Acme Cleveland Corp.* (1st Cir. 1986) 798 F.2d 559, 561.)

---

[3]In some circumstances, a single intolerable incident, such as a crime of violence against an employee by an employer, or an employer's ultimatum that an employee commit a crime, may constitute a constructive discharge. Such misconduct potentially could be found "aggravated." No such misconduct is alleged in this case.

[4]See *Valdez* v. *City of Los Angeles* (hereafter *Valdez*) (1991) 231 Cal.App.3d 1043, 1056 [282 Cal.Rptr. 726] ("In general, a 'single isolated instance' of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge. . . . Thus, the mere failure to promote the plaintiff, even if unlawfully discriminatory, will not support a finding of constructive discharge. . . . Nor is it sufficient to show only that the employee received a poor performance rating."); *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 401 [3 Cal.Rptr.2d 6] (hereafter *Soules*) ("Further, demotion of job level, even when accompanied by reduction in pay, does not constitute constructive discharge.").

### b. *An Objective Standard*

■ As the citations and quotations in the previous section reveal, the cases are in agreement that the standard by which a constructive discharge is determined is an objective one—the question is "whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit." (*Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 212 [23 Cal.Rptr.2d 793] [hereafter *Rochlis*], citing *Brady, supra,* 196 Cal.App.3d at p. 1306 and *Lojek v. Thomas* (9th Cir. 1983) 716 F.2d 675, 681.)[5]

### c. *Employer Knowledge and Intent*

■ A constructive discharge is the practical and legal equivalent of a dismissal—the employee's resignation must be *employer*-coerced, not caused by the voluntary action of the employee or by conditions or matters beyond the employer's reasonable control.

In *Brady,* the Court of Appeal concluded that a majority of other courts had declined to impose a requirement of express employer intent in constructive discharge cases and adopted instead an element mandating only the employer's "*actual* or *constructive* knowledge of the intolerable actions and of their impact on the employee" in a situation the employer "could have remedied." (*Brady, supra,* 196 Cal.App.3d at p. 1306, italics added.) The *Brady* court did not define the term "constructive knowledge," but observed that its goal in developing a test for constructive discharge was "to insure that a peaceful on-the-job resolution has been attempted or was futile." (*Ibid.*)

From our review of the cases, we conclude that *Brady*'s test is inadequate to the extent it allows a claim for wrongful discharge on a finding that the employer had mere constructive knowledge of the intolerable conditions leading to an employee's resignation, because such a test does not further the *Brady* court's goal of insuring corrective measures will be attempted before a lawsuit is required. Although the majority of courts have declined to join the Fourth Circuit in requiring an employer's *express* intent to force an employee to leave, they have generally demanded that the "intolerable conditions" causing a constructive discharge be expressly "created by or

---

[5]See also *Slack, supra,* 423 S.E.2d at page 556; 93 A.L.R.Fed., *supra,* at page 16 (Courts "generally recognize the view that the standard of intolerability is an objective one, viewed from the standpoint of the reasonable person . . . . These courts generally hold that a constructive discharge occurs when an employer makes working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign.").

known to the employer." (*Slack, supra,* 423 S.E.2d at p. 558.) Thus, an employer's intent to create or purposefully maintain working conditions that are intolerable from the standpoint of a reasonable employee has been deemed sufficient for a constructive discharge because it insures the claim is employer-coerced. An employer's actual knowledge of the existence of such conditions, and subsequent failure to remedy them, may constitute circumstantial evidence that the employer deliberately forced the employee to resign.

For example, in *Goss* v. *Exxon Office Systems Co.* (3d Cir. 1984) 747 F.2d 885, 888, the court stated: "[N]o finding of an [*express*] intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer *knowingly permitted* conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." (Italics added.)

And in *Beye,* the court emphasized that although an "express intent" was not necessary in constructive discharge cases: "It suffices if the employer's actions *were deliberate, or, in cases of harassment by supervisors or fellow employees, if the employer was aware of the situation and permitted it to continue.*" (*Beye, supra,* 477 A.2d at p. 1202, italics added.)

Finally, following a comprehensive review of the state and federal cases, the West Virginia Supreme Court adopted the "majority view" that "in order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with [an *express*] *intent* to cause the plaintiff to quit." (*Slack, supra,* 423 S.E.2d at p. 558, italics added.)

An employer's intent to cause a resignation will rarely be revealed by direct evidence. Self-interest will most often prevent an employer from announcing a constructive discharge strategy from the rooftops. An *express* intent requirement might unduly focus the trier of fact's attention on the presence or absence of direct evidence. But we see no reason why a standard requiring the employer's actual (rather than mere constructive) knowledge of the intolerable conditions would do so. Such a standard serves to emphasize a central aspect of constructive discharge law—the resignation must be employer-caused and against the employee's will. Consistent with this principle, the employer must either deliberately create the intolerable working conditions that trigger the resignation or, at a minimum, must know about

them and fail to remedy the situation in order to force the employee to resign.

The dissent of Justice Kennard rejects our modification of the *Brady* test, claiming that our actual knowledge test "leaves the employer free to turn a blind eye to blatant and pervasive workplace abuses and to discourage or refuse to entertain employee complaints about intolerable workplace conditions and then claim a lack of actual knowledge of the intolerable conditions as a complete defense to a wrongful discharge action." (Dis. opn., *post*, at p. 1260.) This is a highly exaggerated and unlikely situation that even the dissent admits is not supported by any examples of cases from the majority of jurisdictions that have adopted the identical actual knowledge test for constructive discharge claims. The dissent simply confuses constructive knowledge, which the *Brady* court left undefined, with constructive discharge which, as most courts hold, requires proof that the employer created or knowingly permitted the intolerable conditions to persist. (See, e.g., *Goss* v. *Exxon Office Systems Co.*, *supra*, 747 F.2d at p. 888.)

By providing that a wrongful discharge claim may prevail only if an employee can show the employer, or those representing the employer, either created or knowingly permitted working conditions to remain intolerable, it should be easier for plaintiffs to prove their case in the situation hypothesized by the dissent—i.e., where an employer is either unavailable or refuses to acknowledge that the intolerable conditions exist. (Dis. opn. *post*, at p. 1260.) By requiring employees to notify someone in a position of authority of their plight, we permit employers unaware of any wrongdoing to correct a potentially destructive situation, and we prevent employers from shielding themselves from constructive discharge lawsuits simply by deliberately ignoring a situation that has become intolerable to a reasonable employee. Indeed, our test furthers the *Brady* court's stated goal that a constructive discharge test should encourage an employer to take corrective action if notified of the intolerable working conditions. (*Brady*, *supra*, 196 Cal.App.3d at p. 1306.) As a matter of policy, therefore, our holding requiring the employer (or its agent) either to have created or knowingly permitted the intolerable conditions to exist, encourages early resolution of the employee complaint and, contrary to the dissent, discourages employer inaction.

Finally, the dissent's unnecessary concern over a purely hypothetical situation is aggravated by its reliance on federal circuit court cases that either support our actual knowledge test for constructive discharge cases or focus exclusively on title VII (or its equivalent under title IX) sexual harassment causes of action. (Compare *Paroline* v. *Unisys Corp.* (4th Cir.

1989) 879 F.2d 100 [constructive discharge in sexual harassment case under title VII occurs only when employer deliberately makes work conditions intolerable in an effort to induce employee to quit] with *Ellison* v. *Brady* (9th Cir. 1991) 924 F.2d 872, 880 [title VII claim for sexual harassment is not a fault-based tort claim].) Thus, even though sexual harassment claims sometimes are considered within the context of constructive discharge allegations, the focus in a constructive discharge case is the employer's knowledge and conduct in forcing the employee to resign in light of the intolerable working conditions. (*Ibid.*) In criticizing our modification of the *Brady* test, therefore, the dissent simply strains to create a point of departure where none exists.

### d. *Summary*

The considerations discussed above lead us to modify the elements of constructive discharge in the *Brady* line of cases. In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.

For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees.

To the extent it is inconsistent with these elements in that it requires mere constructive knowledge of the intolerable conditions leading to the employee's resignation, the *Brady* line of cases is disapproved. (See, e.g., *Brady, supra*, 196 Cal.App.3d at p. 1306; *Zilmer, supra*, 215 Cal.App.3d at p. 38; *Soules, supra*, 2 Cal.App.4th at pp. 399-400; *Rochlis, supra*, 19 Cal.App.4th at p. 212.)

### (2) *Wrongful Discharge in Violation of Public Policy*

Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing. Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge*. (*Soules, supra*, 2 Cal.App.4th at pp. 399-400.)

An employee may prove, for example, that a constructive discharge is a breach of an express or implied contract of employment. In the absence of an

express or implied agreement to the contrary, an employment relationship without a fixed term is presumed to be validly terminable at the will of either party, employer or employee, at any time. (Lab. Code, § 2922; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 675-682 [254 Cal.Rptr. 211, 765 P.2d 373] [hereafter *Foley*].) However: "In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' " (*Id.* at p. 680.)

Thus, a constructive discharge may, in particular circumstances, amount to breach of an employer's express or implied agreement not to terminate except in accordance with specified procedures or without good cause. (*Soules, supra,* 2 Cal.App.4th at pp. 399-400.)

Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1094-1095 [4 Cal.Rptr.2d 874, 824 P.2d 680] [hereafter *Gantt*].) An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee. (*Foley, supra,* 47 Cal.3d at pp. 665-671; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] [hereafter *Tameny*].)

(3) *Summary Judgment*

This case arises from a Court of Appeal decision reversing a summary judgment in ABI's favor. ■ Like other civil causes of action, wrongful discharge claims arising in contract or in tort may be susceptible of pretrial disposition on motions for summary judgment. (*Soules, supra,* 2 Cal.App.4th at p. 398.) Summary judgment must be granted when the moving party's evidence is sufficient to sustain a judgment in its favor and the opposing party does not present evidence raising a triable issue of material fact. (*Ibid.*)

In reviewing a ruling on a motion for summary judgment, an appellate court (1) "identif[ies] the issues framed by the pleadings," (2) "determine[s] whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor," and (3) "[w]hen a summary judgment motion prima facie justifies a judgment, . . . determine[s] whether the opposition demonstrates the existence of a triable,

material factual issue." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)[6]

### B. *Turner's Claim for Constructive Wrongful Discharge in Violation of Fundamental Public Policy*

Turner claims ABI subjected him to a "campaign of harassment" because he complained of alleged ABI violations of federal and state laws, internal company policies, and provisions of ABI's collective bargaining agreement. Through declarations submitted in opposition to ABI's summary judgment motion, he catalogs various complaints he made to ABI management shortly after beginning his employment and argues they triggered less-than-satisfactory performance evaluations several years later, thereby causing him to quit.

In light of the governing law discussed in the previous section, Turner's claim suffers from two fatal flaws. First, Turner's declarations fail to show he was subjected to working conditions rendering his job so intolerable that a reasonable person in his position would have felt compelled to resign. Thus, he did not show that his resignation amounted to a constructive discharge. Second, even assuming a colorable claim of constructive discharge was shown, Turner did not establish the required nexus between his alleged "whistle-blowing" activities in reporting allegedly illegal conduct, and negative reviews of his performance coming four years later. For either of these independent reasons, Turner failed to create a triable issue of fact, and ABI was entitled to summary judgment in its favor.

### (1) *No Constructive Discharge*

Observing that Turner resigned more than four years after his "whistle-blowing" reports of alleged misconduct by ABI employees, ABI contends Turner's claim fails as a matter of law under the "statute of limitations" rule announced in *Panopulos* v. *Westinghouse Electric Corp.* (1989) 216 Cal.App.3d 660 [264 Cal.Rptr. 810] (hereafter *Panopulos*). Turner urges us to reject the rule in *Panopulos* in favor of the more fact-specific and flexible principles applied in *Valdez, supra,* 231 Cal.App.3d 1043.

In *Panopulos,* plaintiff resigned in 1983 and thereafter filed suit for constructive discharge in violation of an implied contract. Plaintiff maintained he had been transferred in 1978 and made to work under intolerable

---

[6]ABI's motion for summary judgment was heard and granted in 1989, well before the 1992 amendments to the summary judgment statute. (See, e.g., Code Civ. Proc., § 437c, subd. (n), added by Stats. 1992, ch. 1348, § 1.) Therefore, our discussion of summary judgment procedure necessarily reflects pre-1993 law. We have no occasion in this case to determine the effect of section 437c as amended.

conditions until his resignation. Reasoning that "sound policy requires that there be a limit beyond which claims such as that of plaintiff here may not be asserted," the *Panopulos* court held "the applicable limitations period must constitute an outer limit beyond which an employee may not, as a matter of law, remain employed after the onset of allegedly intolerable conditions and thereafter maintain a claim for wrongful constructive discharge." (*Panopulos, supra,* 216 Cal.App.3d at pp. 669, 670.). Because plaintiff's transfer had occurred more than four years (the longest applicable limitations period) before his resignation, the court held his suit time-barred.

■ Although we agree with *Panopulos* that there is an "outer limit" beyond which an employee cannot remain on the job after intolerable conditions arise and still claim constructive discharge, reliance on the applicable limitations period to define that limit is unduly arbitrary. Consistent with our discussion in part II.A.(1) above, the relevant question is what a reasonable employee would have done under the circumstances. The length of time the plaintiff remained on the job may be *one* relevant factor in determining the intolerability of employment conditions from the standpoint of a reasonable person. Neither logic nor precedent suggests it should always be dispositive. (See *Valdez, supra,* 231 Cal.App.3d at p. 1058.) Insofar as it prescribes the statute of limitations as an outer limit on an employee's decision to "weather the storm," we disapprove *Panopulos.*[7]

■ Despite our rejection of *Panopulos,* we find no merit in Turner's constructive discharge allegations. Turner appears to rely on three kinds of allegedly intolerable conditions that he claims precipitated his resignation in 1989: (1) the alleged illegal acts of other ABI employees which he observed and reported in 1984; (2) his reassignment in 1985; and (3) his low performance rating in 1988. None of these purported conditions creates a triable issue of material fact.

The mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee. Turner was not requested, let alone required, to participate in any of the illegal conduct he complains of. Nor does he contest ABI's statements that his supervisors duly acknowledged and investigated at least some of his complaints. Although Turner may have been a witness to allegedly illegal conduct condoned by his employer, the nature of the conduct (violations of state law regulating the economic and contractual relationships between

---

[7]The record suggests there may be some question as to the applicable limitations period in this case. It may be four years (Code Civ. Proc., § 343), two years (*id.,* 339, subd. 1), or one year (*id.,* § 340, subd. (3)). Because of our rejection of the *Panopulos* rule, we need not and do not decide this question.

beverage manufacturers and their customers and competitors) was not so obnoxious or aggravated as to cause a reasonable employee to feel compelled to resign.

Moreover, the so-called illegal acts in 1984 and Turner's 1985 reassignment were remote in time and context from the 1989 resignation. Although not dispositive, the passage of this much time after purportedly unbearable conditions arose strongly suggests that neither Turner, nor a reasonable employee, would have regarded the working conditions at ABI as intolerable.[8] (*Wagner* v. *Sanders Associates, Inc.* (C.D.Cal.) 638 F.Supp. 742, 745 [passage of time between allegedly intolerable condition and resignation "goes a long way toward destroying" assertion that conditions were intolerable]; *Vaughn* v. *Pool Offshore Co.* (5th Cir. 1982) 683 F.2d 922, 926 [no constructive discharge when alleged misconduct occurred several months prior to resignation].)

Finally, Turner's 1988 performance rating, an event he contends triggered his resignation, is not a basis for a claim of constructive discharge. As we have observed in part II.A.(1), *ante*, a single negative performance rating does not amount to a constructive discharge. "In order to properly manage its business, every employer must on occasion review, criticize, demote, transfer, and discipline employees." (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743], quoted in *Soules*, *supra*, 2 Cal.App.4th at p. 401.) Thus, the dissent errs in claiming that Turner's pleadings show a campaign to drive him "out of the company by means of adverse performance evaluations based on charges deliberately fabricated." (Dis. opn., *post*, at p. 1270.)

Even if Turner's miscellaneous charges of employer misconduct are considered together, no continuous pattern of harassment or aggravating conditions emerges. (See *Soules*, *supra*, 2 Cal.App.4th at p. 402.) Turner concedes that he received good performance reviews and increases in his compensation from 1985-1987, more than three years after his complaints of illegal activity. He also admits that he resigned when he did because he believed ABI was "setting him up" for termination and that his "chances would be better" in future litigation if he preempted his discharge. Turner's attempt to weave unrelated and disjointed events together into an insidious pattern unravels quickly in these circumstances. Turner's resignation was voluntary and strategic, not, as the dissent claims, coerced or compelled by ABI's acts. In short, Turner was not constructively discharged.

---

[8]The Court of Appeal suggested that Turner may have postponed his resignation in an effort to secure retirement benefits. As ABI notes, there was no contention by Turner, nor any evidence before the court, that Turner waited to resign until he was eligible for retirement benefits. Turner does not challenge this assertion.

*(2) No Wrongful Discharge in Violation of Fundamental Public Policy*

█ As we observed in part II.A.(2), *ante*, even if Turner could raise a triable issue of fact as to constructive discharge, his case cannot reach the trier of fact unless he can also show a *wrongful* discharge in violation of fundamental public policy.

█ In order to sustain a claim of wrongful discharge in violation of fundamental public policy, Turner must prove that his dismissal violated a policy that is (1) fundamental,[9] (2) beneficial for the public,[10] and (3) embodied in a statute or constitutional provision. (*Gantt, supra,* 1 Cal.4th at p. 1095.)

Tort claims for wrongful discharge typically arise when an employer retaliates against an employee for "(1) refusing to violate a statute . . . [,] (2) performing a statutory obligation . . . [,] (3) exercising a statutory right or privilege . . . [, or] (4) reporting an alleged violation of a statute of public importance. (*Gantt, supra,* 1 Cal.4th at pp. 1091-1092, fn. omitted.)

█ Most of Turner's complaints pertained to ABI's alleged violations of its own internal practices or its collective bargaining agreements. For example, Turner alleges that, despite his complaints and expressed opposition, his supervisor, George Liakos, violated (1) a conflict of interest provision of the company's collective bargaining agreement, (2) collective bargaining agreement provisions "relative to wages, benefits and job security," (3) internal ABI policy concerning employment of family members, and (4) ABI policy concerning use of refrigerated delivery trucks.

Turner also maintains that Liakos "harassed" employees who failed to implement ABI policies concerning refrigeration of beer, arbitrarily and capriciously performed annual evaluations of salaried employees, used threats of probation and harassment to subject all salaried employees to his "whimsical" practices, fabricated merit reviews to justify decisions to discharge employees, and falsified records at ABI's Riverside operation to further its success in interbranch sales competitions.

---

[9]See also *Foley, supra,* 47 Cal.3d at page 670, footnote 11 (policy must be " 'firmly established'. . . , 'fundamental'. . . , and 'substantial' "); *Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480 [16 Cal.Rptr.2d 888] ("constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law").

[10]The interest advanced by the policy must inure to the benefit of the public at large, rather than simply to the individual employer or employee. (*Gantt, supra,* 1 Cal.4th at pp. 1090, 1095-1096; see *Foley, supra,* 47 Cal.3d at p. 669.)

Assuming, as we must in a summary judgment posture, that Turner could prove these claims at trial, none of them implicates a fundamental public policy embodied in a statute or constitutional provision. The tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others. Turner's failure to identify a statutory or constitutional policy that would be thwarted by his alleged discharge dooms his cause of action.

Turner does refer in some of his claims to statutory provisions. He charges that ABI management employees Liakos and Schmitt violated unspecified provisions of "the [federal] Alcohol, Tobacco and Firearms laws." He points to Schmitt's alleged gifts to alcohol retailers "in contravention of ABC laws." According to Turner, Schmitt also instructed sales personnel to remove or tear down competitor's products and advertising, to make consignment sales of alcoholic beverages in violation of "ABC Act § 25503."

Turner's vague charge of "Alcohol, Tobacco and Firearms laws" violations, largely unaccompanied by citations to specific statutory or constitutional provisions, puts ABI and the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of Turner's claims.[11]

Turner does refer to a single provision of California Alcohol Beverage Control Act (Bus. & Prof. Code, § 23000 et seq. [hereafter Act]) to support his claim. Section 25503 of the Act prohibits consignment sales of alcoholic beverages, i.e., arrangements under which title to beverages is retained by the seller or possession may be returned to the seller. (§ 25503, subd. (a).) In addition, section 23104.2 forbids a seller of beer from reacquiring its product "from a retailer except when the beer delivered was not the brand or size container ordered by the retailer, or the amount delivered was other than the amount ordered . . . or if a package had been broken or otherwise damaged prior to or at the time of actual delivery. . . ."

Violations of these sections might be construed as implicating fundamental public policy. The Legislature's declaration of purpose in section 23001

---

[11]Turner also asserts in his brief in this court that his ABI supervisors "harassed" him by "changing his work shift schedule to affect his service on a federal jury panel." Like the balance of Turner's argument, this assertion is both factually and legally devoid of merit. The portion of the record Turner cites shows only that he had some difficulty reaching his immediate supervisor by phone to coordinate his schedule while on jury duty. At the time, he did not feel the problem was sufficiently important even to mention to another ABI manager, with whom Turner was in contact about his jury service. Turner nowhere demonstrates how, if at all, his jury service was interfered with nor, again, does he direct our attention to any specific statute or constitutional provision implicating a fundamental public policy. Thus, Turner fails to meet his burden of showing a triable issue of fact.

of the Act provides as follows: "This division is an exercise of the police powers of the State for the protection of the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages. *It is hereby declared that the subject matter of this division involves in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people.* All provisions of this division shall be liberally construed for the accomplishment of these purposes." (Italics added.)[12]

Assuming that Turner has identified ABI violations of state statutes implicating fundamental public policies, he has nonetheless fallen short of creating a triable issue on a cause of action for wrongful discharge in violation of fundamental public policy. Initially, Turner does not show that he was ever asked to participate in any illegal activity or that he was subjected to harassment for performing a statutory obligation or exercising a statutory right or privilege. (*Gantt, supra*, 1 Cal.4th at pp. 1090-1091.) Therefore, he cannot assert a wrongful discharge claim in the classic *Tameny* sense. (See *Tameny, supra*, 27 Cal.3d 167 [employee discharged for refusing to participate in illegal price-fixing scheme].) Thus, Turner's claim is limited to an assertion of "whistle-blower harassment," i.e., a contention that he was harassed and ultimately forced to quit because he reported to ABI "an alleged violation of a statute of public importance." (*Gantt, supra*, 1 Cal.4th at p. 1091.)

But Turner's claim of whistle-blower harassment fails because he cannot demonstrate the required nexus between his reporting of alleged statutory violations and his allegedly adverse treatment by ABI. Turner's reporting activity occurred some four to five years before the negative performance evaluations that Turner maintains caused him to quit. Indeed, contrary to the dissent, there is no indication in the record that management regarded Turner as a disloyal employee and troublemaker for his reporting of illegal activity. In response to Turner's complaints, ABI managers did not dismiss his concerns or admonish him to cease communication, but investigated and made their own determinations that illegal activity was not taking place. The ABI managers receiving Turner's reports were not on the scene when other ABI managers later found his performance less than satisfactory. Turner's performance evaluations and status within ABI were generally satisfactory

---

[12]In addition, although Turner does not cite the applicable law, ABI's alleged conduct in interfering with product display and advertising of competing sellers inside retail outlets might be construed as illegal "ribbonizing" in violation of Business and Professions Code sections 25502, subdivision (b) and 25503.3 and California Code of Regulations, title 4, section 106, subdivision (b). (*Markstein Distributing Co.* v. *Rice* (1976) 65 Cal.App.3d 333 [135 Cal.Rptr. 255].)

throughout the three-year period following his complaints. On their face, the evaluations appear to be regularly prepared and well documented.

The only reasonable inference from the record before us is that Turner's evaluation reflected a bona fide assessment of his job performance, not a retaliatory blow for reporting alleged illegalities remote in time, place, and context from the evaluation setting.

### III. DISPOSITION

For the reasons stated above, Turner's claim for constructive wrongful discharge in violation of fundamental public policy fails as a matter of law. The trial court was correct in granting summary judgment in ABI's favor. We therefore reverse the judgment of the Court of Appeal and direct a summary judgment in favor of ABI. ABI shall recover its costs.

Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I join in part I. of Justice Kennard's dissenting opinion. I agree, for reasons concisely stated therein, that an employer with constructive rather than actual knowledge of an employee's intolerable working conditions should not be able to escape liability for a constructive wrongful discharge.

I am also in accord with part II.C. of Justice Kennard's dissent. The facts and allegations of this case depict an employer who may have acted from a combination of motives, some legitimate, others not. It should be for the trier of fact to untangle this complex causal web to decide whether Turner's complaint about the company's illegal marketing practices in 1984 substantially contributed to his constructive discharge in 1988.

Nonetheless, I concur in the judgment of the majority because I agree that, as a matter of law, Turner did not suffer in his employment "actions and conditions . . . so intolerable or aggravated at the time of the employee's resignation that a reasonable person in the employee's position would have resigned." (*Brady* v. *Elixir Industries* (1987) 196 Cal.App.3d 1299, 1306 [242 Cal.Rptr. 324].) I agree in principle with Justice Kennard that unjustified poor performance evaluations may, in the proper context, constitute an intolerable condition that would cause a reasonable employee to resign. The majority opinion does not declare otherwise. But, although an employee who believes he must look forward to a series of undeservedly negative performance evaluations that will blot his employment record and block his chances for advancement may be able to maintain a cause of action for

constructive discharge, a single "needs improvement" evaluation after four years of good evaluations does not reasonably warrant that belief. A plaintiff must show at least that the questionable evaluation is more than a singular or occasional occurrence.

Moreover, the view that the conditions of Turner's workplace were not truly "intolerable" is reinforced by his statement that the resignation was dictated by strategic considerations in pursuit of future litigation. (Maj. opn., *ante*, at p. 1254.) This damaging admission confirms the picture that emerges from the record before us—and before the trial court—that Turner's allegations of intolerable conditions cannot be substantiated.

On this limited basis, I concur in the judgment of the majority.

**KENNARD, J.**—I dissent.

First, I do not agree with the majority's modification of the established elements for a claim of constructive discharge in violation of public policy. The majority asserts that to succeed on such a claim, the employee must prove that the employer possessed actual and not merely constructive knowledge of the plaintiff's allegedly intolerable working conditions. By excluding constructive knowledge, the majority leaves the employer free to turn a blind eye to blatant and pervasive workplace abuses and to discourage or refuse to entertain employee complaints about intolerable workplace conditions and then claim lack of actual knowledge of the intolerable conditions as a complete defense to a wrongful discharge action. Analogous federal and state law, and considerations of sound public policy, support the constructive knowledge component of the established test for wrongful constructive discharge.

Second, I do not agree with the majority's conclusion that the employer in this case is entitled to summary judgment. Fairly read, the record of the trial court proceedings provides no basis for summary judgment.

## I.  CONSTRUCTIVE KNOWLEDGE

In *Brady* v. *Elixir Industries* (1987) 196 Cal.App.3d 1299, 1306 [242 Cal.Rptr. 324], the Court of Appeal identified the elements of a cause of action for wrongful constructive discharge in violation of public policy: "(1) the actions and conditions that caused the employee to resign were violative of public policy; [¶] (2) these actions and conditions were so intolerable or aggravated at the time of the employee's resignation that a reasonable person in the employee's position would have resigned; and [¶] (3) facts and circumstances showing that the employer had *actual or constructive knowledge* of the intolerable conditions and of their impact on the employee and could have remedied the situation." (Italics added.)

This definition of constructive discharge has met with unanimous approval in subsequent decisions of the Courts of Appeal. (See, e.g., *Rochlis* v. *Walt Disney Co.* (1993) 19 Cal.App.4th 201, 212 [23 Cal.Rptr.2d 793]; *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 399 [3 Cal.Rptr.2d 6]; *Valdez* v. *City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1059 [282 Cal.Rptr. 726]; *Zilmer* v. *Carnation Co.* (1989) 215 Cal.App.3d 29, 36-37 [263 Cal.Rptr. 422].)

Nevertheless, the majority disapproves this definition to the extent that it would allow proof of the employer's constructive rather than actual knowledge of the intolerable conditions that forced the employee to resign. I disagree.

At the outset, I note that the majority's entire discussion of this point is unnecessary because plaintiff is not proceeding on a theory that his employer had constructive rather than actual knowledge of his allegedly intolerable working conditions. As the majority acknowledges, in this context the term "employer" includes "supervisory employees." (Maj. opn., *ante*, p. 1255.) Thus, proof that plaintiff's immediate supervisors knew of his allegedly intolerable working conditions is sufficient. Here, plaintiff has alleged not only actual knowledge by his immediate supervisors, but also that they intentionally created the intolerable conditions in retaliation for his opposition to their actions and policies and for the purpose of forcing plaintiff's resignation.

The issue of constructive knowledge could arise only in a case in which the employee's plight is unknown not only to the employing company's management, but also to the affected employee's immediate supervisor, a situation that is not alleged in this case.

Nevertheless, because the majority has chosen to address the issue, and because its determination of the issue will no doubt be accepted as the law of California, I will respond.

Apart from the Court of Appeal's decision in *Brady* v. *Elixir Industries*, *supra*, 196 Cal.App.3d 1299, and the unanimous acceptance of that decision by this state's appellate courts, is there other substantial persuasive authority for the inclusion of an employer's constructive knowledge within the elements of constructive wrongful discharge? There is.

As the majority explains, federal courts have considered the elements of constructive wrongful discharge in the context of actions brought under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and a clear majority of the federal appellate courts has rejected a requirement that the

employer intend to force the employee to resign. Under the majority rule in title VII cases, "a constructive discharge occurs whenever the complainant's resignation results from intolerable working conditions, *for which the employer is responsible,* that would have caused a reasonable person in the plaintiff's position to resign." (Lindemann & Kadue, Sexual Harassment in Employment Law (1992) p. 260, italics added.) Thus, employer responsibility is an element of a title VII claim for constructive discharge. How is employer responsibility established under title VII?

To implement title VII, the Equal Employment Opportunity Commission (EEOC) has issued a variety of regulations, including guidelines on discrimination because of sex (29 C.F.R. § 1604.1 et seq. (1993)) and discrimination because of national origin (*id.,* 1606.1).[1] With regard to harassment by coworkers because of sex or national origin, these guidelines provide that the employer is responsible for the harassment in the workplace where the employer (or its agents or supervisory employees) "knows or *should have known* of the conduct," unless the employer "can show that it took immediate and appropriate corrective action." (*Id.,* §§ 1604.11(d) [sexual harassment], 1606.8(d) [harassment because of national origin], italics added.) Thus, the EEOC guidelines impose liability on an employer who has constructive knowledge of abusive workplace conditions and fails to act promptly and appropriately to remedy the situation.

This test for employer responsibility for the abusive acts of coworkers has been widely adopted by the federal courts, which have applied the test not only to acts of sexual harassment, but also to harassment on the basis of race, ethnic origin, and other prohibited grounds. Indeed, *every* federal appellate court that has considered the question has held that, absent prompt and appropriate corrective action, an employer is liable for a hostile workplace environment of which the employer has constructive knowledge. (*Lipsett* v. *University of Puerto Rico* (1st Cir. 1988) 864 F.2d 881, 901 [applying title VII standard in a title IX case]; *Kotcher* v. *Rosa and Sullivan Appliance Center, Inc.* (2d Cir. 1992) 957 F.2d 59, 63; *Andrews* v. *City of Philadelphia* (3d Cir. 1990) 895 F.2d 1469, 1486; *Paroline* v. *Unisys Corp.* (4th Cir. 1989) 879 F.2d 100, 107; *Nash* v. *Electrospace System, Inc.* (5th Cir. 1993) 9 F.3d 401, 403; *Kauffman* v. *Allied Signal, Inc., Autolite Div.* (6th Cir. 1992) 970 F.2d 178, 183; *Juarez* v. *Ameritech Mobile Communications, Inc.* (7th Cir. 1992) 957 F.2d 317, 320; *Hall* v. *Gus Const. Co., Inc.* (8th Cir. 1988) 842 F.2d 1010, 1015; *Ellison* v. *Brady* (9th Cir. 1991) 924 F.2d 872, 881; *Hirschfeld* v. *New Mexico Corrections Dept.* (10th Cir. 1990) 916 F.2d 572,

[1]The EEOC has also issued guidelines for discrimination because of religion (29 C.F.R. § 1605.1 et seq. (1993)), but the guidelines for religious discrimination do not appear to define employer responsibility for harassment by coworkers.

577; *Steele* v. *Offshore Shipbuilding, Inc.* (11th Cir. 1989) 867 F.2d 1311, 1316; see also Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII* (1984) 97 Harv.L.Rev. 1449, 1462-1463.)[2]

California law follows federal law on this point. Like title VII, the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) prohibits workplace harassment on sexual, racial, and other grounds. When prohibited harassment by a coworker results in a hostile workplace environment, California law, like title VII, imposes liability on an employer who has constructive knowledge of the harassment, unless the employer has taken appropriate remedial action. In the words of the statute, "[h]arassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows *or should have known of* this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, 12940, subd. (h)(1), italics added.)

Under what circumstances might an employer (or its agents, including immediate supervisors) be said to have constructive knowledge of an employee's intolerable working conditions attributable to the actions of co-workers or subordinates? First, constructive knowledge exists when the intolerable conditions, or the improper practices that result in the intolerable conditions, are so obvious and pervasive that any reasonably attentive employer would notice them. (See *E.E.O.C.* v. *Hacienda Hotel* (9th Cir. 1989) 881 F.2d 1504, 1516; *Hunter* v. *Allis-Chalmers Corp., Engine Div.* (7th Cir. 1986) 797 F.2d 1417, 1422; *Taylor* v. *Jones* (8th Cir. 1981) 653 F.2d 1193, 1199; Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII, supra,* 97 Harv.L.Rev. 1449, 1462, fn. 69; Lindemann & Kadue, Sexual Harassment in Employment Law, *supra,* pp. 242-244.) Second, constructive knowledge exists when the employer declines to read or listen to employee complaints, otherwise discourages employee complaints, or gives the employee no reasonably available means to complain. (See *Kotcher* v. *Rosa and Sullivan Appliance Center, Inc., supra,* 957 F.2d 59, 63;

---

[2]In most instances, the language of the federal appellate court rulings closely tracks the language of the EEOC guidelines. (E.g., *Andrews* v. *City of Philadelphia, supra,* 895 F.2d 1469, 1486 ["management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action"]; *Katz* v. *Dole* (4th Cir. 1983) 709 F.2d 251, 255 ["the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action"]; *Nash* v. *Electrospace System, Inc., supra,* 9 F.3d 401, 403 ["the employer either knew or should have known of the harassment and failed to take prompt remedial action"].) The one exception is the Second Circuit, which has phrased the rule under which an employer is responsible for a hostile environment resulting from coworker harassment in terms of a requirement that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." (*Kotcher* v. *Rosa and Sullivan Appliance Center, Inc., supra,* 957 F.2d 59, 63.)

*Levendos* v. *Stern Entertainment, Inc.* (3d Cir. 1990) 909 F.2d 747, 753 [116 A.L.R.Fed. 653].)

The constructive knowledge component of the established test for wrongful constructive discharge is supported by logic, sound public policy, and analogous but persuasive authority under title VII. I would retain it.

## II.  SUMMARY JUDGMENT

Disagreeing with the Court of Appeal, the majority concludes that defendant was entitled to summary judgment because of "two fatal flaws" in plaintiff's claim for constructive discharge in violation of public policy. (Maj. opn., *ante*, p. 1253.) The asserted flaws are, first, insufficient proof that plaintiff's working conditions were intolerable at the time he resigned and, second, insufficient nexus between plaintiff's complaints about illegal activities and his adverse performance evaluations. To explain why the majority's conclusion is erroneous, I will review the pertinent facts and then discuss each of the claimed "fatal flaws."

### A.  *Facts*

Plaintiff's complaint includes a claim for constructive discharge in violation of public policy. In support of that claim, the complaint makes these allegations:

In January 1984, Anheuser-Busch, Inc. (ABI) hired plaintiff to work at its plant in Riverside. On or about January 31, 1989, plaintiff was forced to resign after his supervisors "lodged a campaign of harassment to create intolerable conditions and to constructively terminate plaintiff" because of plaintiff's opposition to various practices that plaintiff regarded as illegal or otherwise improper. These improper practices included: (1) violations of "Alcohol, Tobacco and Firearms laws"; (2) violations of collective bargaining agreement provisions concerning conflicts of interest, wages, benefits, and job security; (3) violations of company policies prohibiting family members and relatives working in the same department, and requiring temperature control of draught beer to prevent spoilage; and (4) manipulation of sales records to artificially improve the Riverside plant's performance compared to other ABI facilities.

To justify punitive action against plaintiff, plaintiff's supervisors solicited and encouraged coworkers to fabricate accusations against plaintiff and to document these false accusations, which could then be used in annual merit reviews. Plaintiffs' supervisors also harassed plaintiff by changing his work shift schedule to affect his service on a federal jury panel.

ABI answered the complaint with a general denial (Code Civ. Proc., § 431.30, subd. (d)) and the assertion of various defenses. Eventually, after other proceedings not relevant here, ABI moved for summary judgment. In support of its motion for summary judgment, ABI relied upon excerpts from plaintiff's deposition and upon declarations by two of plaintiff's supervisors, George Liakos and Bill Richards. In opposition to ABI's summary judgment motion, plaintiff submitted a declaration by himself, excerpts from Liakos's deposition, and additional excerpts from plaintiff's own deposition. Considering all this evidence, the following picture emerges.

ABI employed plaintiff at its wholesale operations division (WOD) in Riverside from January 1984 until plaintiff's resignation on January 3, 1989. The Riverside WOD serves as a distribution center for the sale of ABI's beer and related products throughout Southern California. Plaintiff had previously worked for ABI as the industrial relations manager at its Los Angeles brewery in Van Nuys from 1975 to 1981.

George Liakos was the general manager at the Riverside WOD. He hired plaintiff in the position of branch off-premises coordinator with responsibility for the Riverside WOD's beer sales to retailers, such as liquor stores and supermarkets, that sell alcoholic beverages for consumption away from the retailers' premises. Plaintiff began work in January 1984. His immediate supervisor was William Schmitt, the sales manager, who reported directly to Liakos.

On his first performance appraisal, in June 1984, plaintiff received an overall rating of "good," which the appraisal form defines as "consistently dependable and competent performance of the job." The report was divided into 14 rating categories. Plaintiff received a "good" rating in 11 categories, a "very good" rating in 2 categories, and a "needs improvement" rating in 1 category. Schmitt performed the appraisal, and Liakos approved it.

On his next appraisal, in December 1984, plaintiff received an overall rating of "needs improvement," which the appraisal form defines as "performance which does not meet minimum level of acceptability, and is not good enough to warrant recognition or greater responsibility." He retained a "good rating" in five categories, and a "very good" rating in one category, but he received a "needs improvement" rating in eight categories. On this evaluation as well, Schmitt made the appraisal, and Liakos approved it.

The parties agree that the June 1984 evaluation was based solely on an objective evaluation of plaintiff's performance during the appraisal period, but they disagree about the reason for the "needs improvement" rating in the

December 1984 evaluation. The written appraisal states that the lower rating was caused primarily by plaintiff's failure to timely and accurately complete important sales reports and to follow through on sales and marketing projects. In his declaration, Liakos states that the appraisal was based "solely on an objective review of Plaintiff's performance during the appraisal period." By contrast, plaintiff's deposition reveals his belief that he had performed competently during the rating period and that the adverse rating was given in retaliation for his complaints about certain practices by his supervisor, Schmitt.

During his deposition, plaintiff testified about the following incidents:

(1) Plaintiff received information that Schmitt had directed one employee (Elledge) to have some Anheuser-Busch jackets made and to provide them as gifts to an ABI customer (a liquor retailer). Believing this conduct to be in violation of state or federal law,[3] plaintiff reported the matter to Liakos. In a later conversation with plaintiff, Liakos said that Schmitt had admitted giving the jackets to retailers. According to plaintiff's declaration, Liakos told plaintiff he "had made arrangements for Schmitt to have the customers make payments for the material which was given in violation of the Alcohol and Beverage Commission regulations."[4]

(2) Plaintiff received information that Schmitt had directed another employee (Newman) to give a different ABI customer tickets to professional baseball games. Plaintiff relayed this information to Bill Richards, the operations manager, who at the time was his supervisor.

(3) Schmitt encouraged ABI sales employees to remove competitors' advertising displays from retail liquor stores. At the morning meeting of the sales department, Schmitt would initial the purloined displays and award the responsible employee points toward "salesman of the month." During the course of the meeting, Schmitt would, in plaintiff's words, "take these things, some of these things that were particularly good and he would hold them up as documentation, identify the person who brought them in and give him an 'atta boy.'" Based on briefings by ABI attorneys, plaintiff believed

---

[3]Plaintiff's belief was well founded: By state law, a liquor wholesaler is generally prohibited from giving any gift to any off-premises retailer or in connection with the sale or distribution of any alcoholic beverage. (Bus. & Prof. Code, §§ 25502, subd. (a)(2), 25600; see also, *Smith* v. *Brown-Forman Distillers Corp.* (1987) 196 Cal.App.3d 503, 510 [241 Cal.Rptr. 916]; *Markstein Distributing Co.* v. *Rice* (1976) 65 Cal.App.3d 333 [135 Cal.Rptr. 255].)

[4]In his declaration, Liakos admitted that plaintiff had informed him that Schmitt had provided an Anheuser-Busch jacket to a customer, but he stated that upon inquiry Schmitt had told him that the customer had paid for the jacket. Liakos declared that he had been satisfied with this representation and had terminated his investigation. He denied that plaintiff had ever complained to him about other alleged unlawful or improper activity.

that handling or removing a competitor's retail displays was illegal.[5] Plaintiff mentioned his concern to Schmitt. According to plaintiff's testimony, Schmitt responded with these words: "This is not a debating society. If I tell you to do it you do it." Plaintiff then raised the problem with Liakos. According to plaintiff, Liakos's response was: "Thank you for telling me. I'll handle it."

(4) Plaintiff also complained to Schmitt about fabrication of company documents reflecting the number of times ABI representatives had called on customers. Schmitt's sarcastic reply, as related by plaintiff, was, "We'll call in a priest."

In July 1985, Liakos transferred plaintiff from the sales department to the delivery department, with no change in salary. The reason for the transfer is disputed. In his declaration, Liakos states that he transferred plaintiff because of plaintiff's performance problems in the sales department and because he believed plaintiff's background would be better utilized in the delivery area. By contrast, plaintiff's deposition reveals his conviction that he had performed competently in the sales department and that the transfer, like the adverse performance evaluation, was in retaliation for his complaints about the previously mentioned practices by Schmitt.

In his new position, plaintiff supervised the day-to-day activities of delivery department employees. His immediate supervisor was Steve Garcia, the delivery manager, and his second level supervisor was Bill Richards, the operations manager. Garcia reported to Richards, who in turn reported to Liakos. In performance evaluations in December 1985, December 1986, and November 1987 plaintiff received an overall rating of "good." Richards made the appraisals; Liakos approved them. It is undisputed that these evaluations were based solely on an objective evaluation of plaintiff's performance during the appraisal periods.

In his December 1988 performance appraisal, plaintiff received an overall rating of "needs improvement." The decline from the November 1987 appraisal was dramatic. In the earlier evaluation, plaintiff was rated "good" in eight categories, "very good" in six categories, and "excellent" in one category. He did not receive a single "needs improvement" rating in any of the 15 rating categories. In the December 1988 appraisal, by contrast, plaintiff was rated "needs improvement" in eight categories, and "good" in the remaining seven categories.

---

[5] Plaintiff's belief that it was illegal to handle the products or advertising displays of competing alcoholic beverage distributors was well founded. (See *Smith* v. *Brown-Forman Distillers Corp.*, *supra*, 196 Cal.App.3d 503, 510; *Markstein Distributing Co.* v. *Rice*, *supra*, 65 Cal.App.3d 333.)

Richards and Garcia prepared the December 1988 appraisal, which Liakos approved. The parties dispute the reason for the sudden decline in plaintiff's ratings. In his declaration, Liakos states that the ratings were based solely on an objective evaluation of plaintiff's performance during the appraisal period. More specifically, he states that plaintiff's performance began to deteriorate during mid-1988, in that plaintiff became uncooperative, confrontational with management, and failed to timely complete assigned projects. In Liakos's words, plaintiff appeared to be "an embittered and disgruntled employee." The Richards declaration echoes these allegations of plaintiff's "poor attitude and performance" during this time and provides some specific instances.

Plaintiff, by contrast, maintains that his performance never deteriorated below the level of "good" and that the "needs improvement" performance evaluation was part of a concerted effort of harassment in retaliation for plaintiff's continuing opposition to his superiors' improper practices. He states in his declaration that his supervisors did not question him about the alleged instances of poor performance at the time they occurred, and that Richards raised them for the first time on December 28, 1988. Plaintiff states that he denied the allegations when first confronted with them. As he explained in his deposition, he then believed he was being "set up" for termination; he testified that his supervisors had used similar tactics in the past with other employees, whom he named.[6]

During his tenure with the delivery department, plaintiff complained to Riverside WOD management about actions he believed were in violation of ABI's union contracts. Specifically, he complained that ABI was violating its union contract by subcontracting the task of washing delivery trucks to a company owned by Garcia, the delivery manager, when this task should have been performed by ABI employees who were union members. Plaintiff complained to Garcia, Richards, and Liakos about this contract violation.

Plaintiff also informed Liakos about a provision of the union contract defining eligibility for what plaintiff described as "health and welfare benefits." Plaintiff told Liakos that ABI could be "in jeopardy" for withholding

---

[6]Plaintiff described the case of an employee named Van Hoy, who had reported to ABI's head office in St. Louis that employees at the Riverside facility were fabricating sales documents "for accounts that never received the goods." Van Hoy's report triggered an investigation, as a result of which two employees were fired. But Van Hoy was given reduced responsibilities, his keys were taken away, and he was not allowed to handle cash any more. Plaintiff stated that Van Hoy "got the message and left."

Plaintiff also testified that Bosman, Hocking, Dunez (or Dunaj), and Peterson were four Riverside WOD employees whose merit reviews had been fabricated to encourage them to "terminate rather than be fired."

benefits under this provision. He recommended that the provision be revised when the union contract was renegotiated, but it was never changed. Plaintiff also believed that the company was violating a contract provision stating, in plaintiff's words, that "clerical staff would be paid for 40 hours and work 37 and a half." When plaintiff mentioned this problem to Liakos, Liakos replied, "We'll live with it until we are caught."

Plaintiff also complained that the Riverside facility was not following ABI policies requiring temperature control of draught beer, with the result that the beer was in danger of spoilage.

On January 3, 1989, approximately one week after the discussion with Richards about his performance evaluation, plaintiff tendered his letter of resignation, effective January 31.

### B. *Intolerable Conditions*

The essential elements of a claim for constructive discharge in violation of public policy are, as I have previously observed, the following: (1) working conditions so intolerable or aggravated that a reasonable person in the employee's position would have felt compelled to resign; (2) circumstances sufficient to establish the employer's responsibility for the intolerable conditions, and (3) circumstances showing that the discharge violated public policy. (*Brady* v. *Elixir Industries, supra,* 196 Cal.App.3d 1299, 1306.) The majority concludes that the state of the evidence relating to the first element—intolerable working conditions—warrants summary judgment for defendant ABI. I disagree. Although I would not characterize the evidence of intolerable conditions as "overwhelming," I am convinced it was sufficient to establish a triable issue of fact.

By itself, a single adverse performance review does not constitute intolerable working conditions, even when the low evaluation is unjustified. But the record here, viewed in the light most favorable to the party opposing summary judgment (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]), shows considerably more.

According to plaintiff, the adverse December 1988 performance review was not an isolated incident, but was part of a concerted campaign of harassment designed to force him to leave the company. He has provided some evidence to justify this assertion; defendant's contrary evidence does no more than establish the existence of a triable issue of fact.

Plaintiff suffered two adverse performance reviews, both of which followed plaintiff's complaints about actions of his supervisors that he considered illegal or otherwise improper. After the first adverse evaluation, he was

given a lateral transfer from the sales department to the delivery department. It is a reasonable inference, although disputed by defendant, that Liakos's purpose in transferring plaintiff was to prevent him from observing and opposing activities by Schmitt, the sales manager, that were illegal but that Liakos was willing to tolerate or even encourage because they increased the company's sales. It is also a reasonable inference that after plaintiff opposed certain practices in the delivery department, Liakos made a similar decision to prevent him from observing and opposing improper activities in that department; lateral transfer no longer being feasible, Liakos, in concert with Garcia and Richards, fabricated charges that would support adverse performance evaluations of plaintiff and eventually lead to his discharge or resignation.

It is striking that after some four years in the delivery department, during which plaintiff received uniformly favorable evaluations, he suddenly received a negative evaluation. Plaintiff has explained this anomaly by stating that his performance did not change and that the charges against him were fabricated in retaliation for his opposition to practices in the delivery department. Defendant, by contrast, has offered no explanation for the sudden deterioration in plaintiff's performance that it claimed had occurred.

Plaintiff testified, without contradiction, that his supervisors had not discussed any of the instances of poor performance cited in the December 1988 evaluation at the time they allegedly occurred. This was contrary to normal and sound personnel practices, and it lends credence to plaintiff's belief that he was being "set up" for discharge.

Finally, plaintiff testified, again without contradiction, that Liakos had used the same or similar tactics with other employees who had opposed or reported improper activities at ABI's Riverside facility. This testimony further supports the conclusion that plaintiff was being "set up" for termination or discharge.

The question, then, is not whether one, or even two, adverse performance reviews justify an employee's decision to resign. Rather, the issue is whether a reasonable employee would find working conditions intolerable, and feel compelled to resign, when the employee's supervisors had launched a campaign to drive the employee out of the company by means of adverse performance evaluations, based on charges deliberately fabricated. Knowing that the poor evaluations would continue and would eventually lead to discharge, and knowing also that discharge would reduce the prospects of employment elsewhere, an employee of normal sensibilities might very well find the described situation intolerable. Because plaintiff presented substantial evidence to support this description of his predicament at the Riverside

WOD when he resigned, the existence of intolerable conditions presents a triable issue of fact.

## C. *Nexus*

As to the third element of the claim for constructive discharge in violation of public policy—circumstances showing that the discharge violated public policy—the majority asserts that if there was a constructive discharge in December 1988, uncontradicted evidence establishes that it was unrelated to the illegal activities that allegedly occurred in the sales department in 1984.[7] As I understand the majority opinion, it does not dispute that the alleged violations of alcoholic beverage control laws—including the alleged gifts to retailers and encouraging employees to remove competitors' retail advertising displays—were themselves against public policy, or that discharging an employee in retaliation for opposition to these activities would likewise be against public policy. Rather, the majority concludes that ABI has carried its summary judgment burden of establishing the absence of any causal link between the discharge and the alleged illegal activities. Once again, I disagree.

Plaintiff's complaints about illegal activities in the sales department promptly resulted in an adverse performance evaluation (in December 1984) and a transfer to the delivery department. Whether plaintiff was thereafter a "marked man" within the company is properly a jury question. Assuming that he was, I do not find it implausible that his supervisors allowed an interval of time to pass before stepping up a campaign of harassment designed to force plaintiff to resign or be fired. Indeed, this is exactly how one might expect a legally sophisticated employer to treat an employee it regards as disloyal.

Moreover, the record shows that the period between plaintiff's transfer to the delivery department and his December 1988 adverse performance evaluation was not uneventful. Plaintiff continued to oppose activities he regarded as improper. Although these activities did not violate fundamental public policy (see fn. 7, *ante*), they gave his superiors, and particularly Liakos, continuing grounds to regard plaintiff as a disloyal employee and a troublemaker. Thus, there is sound evidentiary support for plaintiff's belief that his final adverse evaluation was not based on an objective appraisal of his performance, but rather was made to force him out of the company in retaliation for his "disloyal" opposition to established practices at the Riverside WOD. If this is true, then the only issue as to "nexus" is whether the

---

[7] I do not challenge the majority's conclusion that the alleged activities in the delivery department—violations of collective bargaining agreements and internal company policies—were not against fundamental public policy.

negative appraisal was only in retaliation for plaintiff's opposition to certain practices in the delivery department, or whether it was also, in significant part, in retaliation for plaintiff's opposition to law violations in the sales department. In my view, the answer to this question, and thus the existence of the required nexus, presents a triable issue of fact.

The majority offers unpersuasive reasons for denying plaintiff a trial on the merits of his wrongful discharge claim. In my view, the claim is not suitable for summary judgment and should proceed to trial.

### III. Conclusion

An employer who reasonably should know of intolerable workplace conditions, and who does nothing to correct them, should not escape liability when the intolerable conditions force an employee to quit. As I have explained, in reaching out unnecessarily to strike down the constructive knowledge component of the established test for constructive discharge, the majority diverts our state's employment jurisprudence from the judicial mainstream of American employment law.

In this case, moreover, the majority errs in directing summary judgment for the employer. Defendant employer failed to establish that plaintiff employee will be unable to prove any element of his constructive wrongful discharge claim at trial.

For these reasons, I dissent.

Woods (A. M.), J.,* concurred.

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Four, assigned by the Acting Chairperson of the Judicial Council.