[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-13836
_____

D. C. Docket No. 96-00268-CV-WBH-1

ALLIANCE METALS, INC., of Atlanta,

Plaintiff-Counter-Defendant-
Appellee,

versus

HINELY INDUSTRIES, INC., ROBERT F. HINELY, JR.,

Defendants-Counter-Claimants-
Appellants,

STEPHEN C. HINELY, et al.,

Defendants Counter-Claimants.

_____

Appeal from the United States District Court for the
for the Northern District of Georgia

_____

**(August 15, 2000)**

Before BIRCH, BARKETT and ALARCÓN*, Circuit Judges.

_____

*Honorable Arthur L. Alarcón, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

ALARCÓN, Circuit Judge:

Robert F. Hinely, Jr., ("Hinely") appeals from an order of summary judgment in favor of his former employer, Alliance Metals, Inc., of Atlanta ("Alliance Atlanta"), in an action Alliance Atlanta brought against Hinely for breach of his employment contract and trademark infringement. We have jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo, applying the same standards used by the district court and viewing the facts in the light most favorable to the nonmoving party. See Jones v. Bill Heard Chevrolet, Inc., 212 F.3d 1356, 1360 (11th Cir. 2000). Because the district court did not err in concluding Hinely was obligated to comply with the non-competition provision of his employment contract or in finding no genuine issue of material fact as to whether Hinely had infringed Alliance Atlanta's right to the trade name Hinely Aluminum, Inc., we affirm.

I

In March 1994, Alliance Atlanta, a wholly owned subsidiary of Alliance Metals, Inc., acquired the assets of Hinely's company, Hinely Aluminum, Inc., for $500,000 in cash. Among the assets acquired were the Hinely Aluminum, Inc., trade name and "all goodwill relating to the Business as a going concern." Pursuant to a contractual condition of the acquisition, Alliance Atlanta and Hinely

also entered into a five-year employment contract under which Hinely was to serve as Alliance Atlanta's president. In that position, Hinely reported directly to Bradley Evans ("Evans"), chairman and sole shareholder of both Alliance Atlanta and Alliance Metals, Inc.

Under the terms of the employment contract, Hinely was to receive an annual salary of $138,500. In addition, he was to receive a percentage of Alliance Atlanta's net sales and net profits as incentive compensation. Under the terms of the employment contract, Hinely was entitled to review any information on which the calculation of his incentive compensation was based. The contract further provided that

> any dispute about the calculation of Incentive Compensation . . . , the amount due the Employee, or any other matter described herein . . . shall be promptly referred to a "Big Six" accounting firm that is mutually acceptable to the Employer and the Employee . . . . Such accounting firm shall be required to render a decision as to the appropriateness of the objections raised by the Employee within thirty (30) days after the submission of the dispute, and any such decision shall be final and binding on both parties.

The employment contract also contained a non-competition provision providing that

> the Employee hereby agrees with Employer that while in the Employer's employ and through the period ending two (2) years after the termination of his employment hereunder for any reason, he will not (either for himself directly or in the service of or on behalf of any other person, firm, partnership, association, corporation or other business entity) . . .

3

> [e]ngage in or render any services to, or be employed by, any business that competes in the Territory with the Business of the Employer, in the capacity of officer, manager or executive employee, director, consultant or shareholder.

The employment contract provided that it would be "governed by, and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania." Although non-competition covenants are generally disfavored under Pennsylvania law, exceptions to this rule exist for covenants such as this one that protect the buyer of the goodwill of a business, see Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207, 210 (Pa. 1976), and the goodwill acquired through the efforts of an employee, see Sidco Paper Co. v. Aaron, 351 A.2d 250, 252-53 (Pa. 1976).

Hinely received no incentive compensation for the 1994 fiscal year. According to Alliance Atlanta, Hinely was not entitled to any incentive compensation because the company sustained a net loss that year. Hinely suspected Alliance Atlanta had manipulated its records to hide Alliance Atlanta's net profit and eliminate Hinely's incentive compensation. Between February and May 1995, he repeatedly requested, through his attorney and accountant, information upon which the calculation of his incentive compensation was based. Although Hinely asserts that Alliance Atlanta failed to comply fully with its contractual duty to provide such information, he never pursued arbitration as required by the employment contract.

4

On February 17, 1995, Hinely came to suspect the formation of a price fixing agreement between Evans and Alliance Atlanta's primary competitor, Wrisco Industries, Inc. On that day, Evans faxed Hinely a new price list with a cover note stating "[n]ew prices for March no exceptions let me know your feelings." Evans later told Hinely that Wrisco Industries, Inc., was charging the same prices.

On advice of his personal counsel, Hinely reported his suspicions to the United States Department of Justice on February 27, 1995. The Department of Justice initiated an investigation of Evans and Alliance Metals, Inc., for violations of the Sherman Act. Hinely continued to work at Alliance Atlanta and cooperated with the Department of Justice throughout the investigation.

On August 14, 1995, John Webb, the executive vice president of Alliance Metals, Inc., hired Jack Barton to be the new sales manager of Alliance Atlanta's Texas office. As sales manager, Barton was to oversee day-to-day operations of that office.

In an affidavit Hinely filed in opposition to Alliance Atlanta's motion for a preliminary injunction, Hinely alleged that he revealed he had been cooperating with the Department of Justice at an August 25, 1995, meeting with Alliance Atlanta's lawyers.

On September 18, 1995, Webb told Hinely he no longer had responsibility for the operations of the Texas office. Webb told employees in the Texas office that Hinely was the cause of the troubles Alliance Atlanta was having with the Department of Justice. Hinely's salary and title were unaffected by what happened in the Texas office.

In a September 28, 1995, letter to all Alliance Atlanta employees, Evans admitted violating the Sherman Act and stated that he and Alliance Metals, Inc., were cooperating with the Department of Justice. On September 29, 1995, the Department of Justice filed a criminal information charging Evans and Alliance Metals, Inc., with violations of Sherman Act, 15 U.S.C. § 1.

In a letter to Evans dated October 2, 1995, Hinely stated that his own "employment with Alliance Metals of Atlanta, Inc. is terminated effective immediately." He asserted in the letter that Alliance Atlanta had breached the employment contract and constructively discharged him. Hinely alleged that he was constructively discharged because (1) Alliance Atlanta had engaged in price fixing; (2) Alliance Atlanta denied him incentive compensation he was due for fiscal year 1994; (3) Alliance Atlanta would not supply him with information regarding the calculation of his incentive compensation; (4) Alliance Atlanta

6

relieved him of his duties at the Texas office; and (5) Alliance Atlanta blamed him for the company's legal troubles.

On October 6, 1995, Hinely incorporated a competing enterprise offering similar products in the same territory serviced by Alliance Atlanta. He called his new venture Hinely Industries, Inc.

On February 2, 1996, Alliance Atlanta filed this action, alleging breach of contract and trademark infringement. On May 28, 1996, the district court granted Alliance Atlanta's motion for a preliminary injunction prohibiting Hinely's new venture from going forward under the name Hinely Industries, Inc. Hinely subsequently renamed his new company Robert & Sons Aluminum, Inc.

On August 22, 1997, after extensive discovery, Alliance Atlanta filed a motion for summary judgment on its breach of contract and trademark infringement claims. On February 19, 1998, the district court granted partial summary judgment in favor of Alliance Atlanta, finding Alliance Atlanta was entitled to summary judgment on the claim that Hinely breached the non-competition provision of his employment contract. The district court also concluded there was no genuine issue of material fact as to Alliance Atlanta's ownership of rights to the Hinely Aluminum, Inc., trade name or as to the likelihood of confusion between that name and Hinely Industries, Inc.

On September 22, 1998, the district court denied Hinely's motion for reconsideration. On July 23, 1999, the parties stipulated to judgment on the remaining issues, including the amount of damages. The district court entered a final judgment in favor of Alliance Atlanta for $291,633, on August 31, 1999. Hinely filed a timely notice of appeal on September 28, 1999.

II

A

Hinely does not dispute that his actions were contrary to the terms of the non-competition provision of his employment contract. Instead, he contends the district court erred in concluding he was obligated to comply with the non-competition provision. Hinely first argues that he was not obligated to comply with the non-competition provision because Alliance Atlanta's price fixing rendered his entire employment contract unenforceable as illegal and contrary to public policy.

For a contract to be deemed unenforceable as illegal or contrary to public policy, its purpose or object must be contrary to a law or policy of the state. See In re Mohler's Estate, 22 A.2d 680, 682 (Pa. 1941) ("[T]here is general consent that contracts entered into for the purpose of rewarding criminal acts or effectuating some illegal object are void and the courts strike such contracts down."); see also

8

Zlotziver v. Zlotziver, 49 A.2d 779, 781 (Pa. 1946) ("[A] contract is illegal if it has for its object the procurement of a divorce, as where the husband or the wife agrees to institute, or not to defend, a suit for that purpose."). An agreement between Alliance Metals, Inc., and Wrisco Industries, Inc., to fix prices, for example, would be an unenforceable contract. See Ford Motor Co. v. Sweeten Auto. Co., 178 A. 48, 50 (Pa. 1935) ("'A bargain not to bid at an auction, or any public competition for a sale or contract, having as its primary object to stifle competition, is illegal.'" (quoting Restatement (First) of Contracts § 517 (1932)) (emphasis added); see also Restatement (Second) of Contracts § 186(1) & (2) (1979) ("A promise is unenforceable on grounds of public policy if it is unreasonably in restraint of trade. A promise is in restraint of trade if its performance would limit competition in any business . . . ."). The contract in issue here, however, had as its object the employment of Hinely as Alliance Atlanta's president, not price fixing.

Additionally, Hinely incorrectly assumes that, if any term of his employment contract was unenforceable, that would necessarily render the entire contract unenforceable. See Restatement (Second) of Contracts Chapter 8, Topic 1 introductory note (1979) ("Even where both parties make promises, the analysis usually begins with the question of the enforceability of one promise or term of [the contract]. Sometimes the unenforceability of that promise or term will result

9

in the unenforceability of other promises and the denial of any relief to either party. The law, however, is not necessarily so severe."); id. at § 178 (discussing "When a Term is Unenforceable on Grounds of Public Policy"). The "General Provisions" section of Hinely's employment contract expressly provided for the severability of any "particular provision of [the contract] adjudicated to be invalid or unenforceable."

Alliance Atlanta did not obtain a judgment against Hinely for breach of contract based on a refusal or failure by him to perform illegal acts in fulfillment of his contractual duties as president. Rather, the district court entered judgment for Alliance Atlanta based on Hinely's failure to comply with the non-competition provision. Hinely does not challenge on appeal the district court's conclusion that the non-competition provision was enforceable. Hinely's argument that Alliance Atlanta's price fixing rendered the non-competition provision unenforceable as illegal and contrary to public policy therefore fails.

B

Hinely next argues that the non-competition provision was null and void by its own terms. In support of this argument, he points to the passage within the non-competition provision providing that it

> shall be null and void in the event Employee is terminated by
> Employer without cause or if the Employer materially breaches the

10

terms of this agreement and fails to cure any such material breach within thirty (30) days after notice from the Employee specifying the breach and requiring it to be cured.

Hinely contends that the non-competition provision was null and void because (1) he was constructively discharged from Alliance Atlanta; and (2) Alliance Atlanta materially breached the employment contract.

1

Hinely maintains that he was constructively discharged and that the constructive discharge rendered the non-competition provision null and void by its own terms as a "terminat[ion] by Employer without cause." In rejecting Hinely's constructive discharge defense, the district court found that Hinely failed to meet his burden of "produc[ing] evidence from which a reasonable finder of fact could conclude that his working conditions were so intolerable that a reasonable person in his position would be compelled to resign." See Highhouse v. Avery Transp., 660 A.2d 1374, 1376 (Pa. Super. 1995); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999). The district court did not reach the question whether a constructive discharge constituted a "terminat[ion] by Employer without cause." We may, however, affirm the grant of summary judgment on any ground fairly supported by the record. See Rozar v. Mullis, 85 F.3d 556, 564 (11th Cir. 1996). Interpretation of a contract poses a question of

11

law.  See Charles D. Stein Revocable Trust v. General Felt Indus., Inc., 749 A.2d 978, 980 (Pa. Super. 2000).

Pennsylvania courts have neither permitted nor prohibited predicating breach of an employment contract on a constructive discharge.  Courts in other states, however, have recognized that a constructive discharge may constitute a breach of an employment contract permitting termination only for cause.  See, e.g., Tennyson v. School Dist., 606 N.W.2d 594, 602 (Wis. App. 1999) ("Where, as here, an employer's written policy guarantees its employees that they will not be discharged without cause, a constructive discharge without cause constitutes a breach of contract."); Turner v. Anheuser-Busch, Inc., 876 P.2d 1022, 1030 (Cal. 1994) ("An employee may prove . . . that a constructive discharge is a breach of an express or implied contract of employment."); Hammond v. Katy Indep. Sch. Dist., 821 S.W.2d 174, 177 (Tex. App. 1991).

To determine the effect of a constructive discharge on the rights and duties of the parties in this case, we must look to the contract in issue.  See Warehime v. Warehime, 722 A.2d 1060, 1072 (Pa. Super. 1998) ("When the parties to an agreement have chosen to address a particular aspect of their legal relationship by contract, it is the terms of the agreement, as manifestly expressed, that is to determine the rights and liabilities of the parties."); see also Turner, 876 P.2d at

12

1030 ("Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing. Even after establishing constructive discharge, an employee must independently prove a breach of contract or tort . . . ."). "'In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished.'" Charles D. Stein Revocable Trust, 749 A.2d at 980 (quoting Village Beer & Beverage, Inc. v. Vernon D. Cox & Co., Inc., 475 A.2d 117, 121 (Pa. Super. 1984)). If the language appearing in the written agreement is clear and unambiguous, the parties' intent is to be discerned solely from the plain meaning of the words used. See id. "'[W]ritings which comprise an agreement must be interpreted as a whole.'" Id. (quoting Village Beer, 475 A.2d at 121).

The non-competition provision of the employment contract reads as follows:

10. Non-Competition.

 A. The Employee hereby acknowledges the following:

> (1) That, as a shareholder of Hinely Aluminum, Inc., he has received substantial benefit from the purchase by Employer of substantially all of the assets of Hinely Aluminum, Inc. pursuant to the Asset Purchase Agreement;
> (2) That Employee's position with Employer places him in a position of confidence and trust with the customers and Employees of

13

Employer and allows him access to "confidential or proprietary information" (as defined in paragraph 11 hereof) of the Employer; (3) That the type and periods of restrictions imposed by the covenants in this Section 10 are fair and reasonable and such restrictions will not prevent Employee from earning a livelihood; and (4) That the business of the Employer is, in general, a highly competitive business.

B.  Having acknowledged the foregoing matters in Section 10A above, the Employee hereby agrees with Employer that while in the Employer's employ and through the period ending two (2) years after the termination of his employment hereunder for any reason, he will not (either for himself directly or in the service of or on behalf of any other person, firm, partnership, association, corporation or other business entity):

(1) Solicit, contact, call upon, communicate with or attempt to communicate with any customer (or prospective customer) of the Employer with whom Employee has had any contact during the two-year period immediately preceding the termination of his employment with the Employer, for the purpose of acquiring or obtaining the fabrication, distribution or sale of aluminum or other metal products from any business other than Employer;

(2) Solicit, divert or hire away, or attempt to solicit, divert or hire away, any person (other than his sons) then employed by the Employer (or employed at any time by the Employer in the two years prior to the termination of Employee's employment);

(3) Engage in, or render any services to, or be employed by, any business that competes in the Territory with the Business of the Employer, in the capacity of officer, manager or executive employee, director, consultant or shareholder;

(4) Invest in, loan money to, or guarantee all or any part of the obligations of, any person, firm, partnership, association, corporation or other business that competes in the Territory with the Business of the Employer . . . .

(D) Paragraph 10(B) above shall be null and void in the event Employee is terminated by Employer without cause or if the Employer materially breaches the terms of this agreement and fails to cure any such material

14

> breach within thirty (30) days after notice from the Employee specifying the breach and requiring it to be cured.

(emphasis added).

The language of the non-competition provision demonstrates that Alliance Atlanta bargained for a commitment from Hinely that he would not start, participate in, or assist any competitive enterprise for two years after his departure from Alliance Atlanta. The sweeping nature of this provision, including the fact that Hinely was obligated under paragraph 10(B) regardless of the reason for his termination, demonstrates that Alliance Atlanta bargained for assurance that Hinely would not leave Alliance Atlanta and appropriate for himself the business he had helped Alliance Atlanta build.

The express terms of the two narrow "escape clauses" included in paragraph 10(D) indicate that Alliance Atlanta intended to foreclose the possibility that it might inadvertently forfeit the bargained-for protection of the non-competition provision. One of the two escape clauses provided that the non-competition provision would become null and void if, after thirty days notice to Alliance Atlanta and its lawyer, Alliance Atlanta failed to cure a material breach of the employment contract. The inclusion of the thirty-day notice requirement manifests an intent to foreclose inadvertent invalidation of the non-competition provision by an unrecognized material breach.

15

A "terminat[ion] by Employer without cause" was the second escape clause the parties included in paragraph 10(D). We think it significant that the parties inserted the language "by Employer" here instead of using a more common and generic phrasing like "termination without cause" or "termination for other than cause." The latter phrasing was used elsewhere in the employment contract itself.[1] A "terminat[ion] by Employer without cause," as opposed to a "termination without cause" or "termination for other than cause," contemplates a conscious choice by Alliance Atlanta to terminate Hinely without cause in order to free him from his contractual duty not to compete.

We conclude that the language "terminat[ion] by Employer without cause" manifests the intent to foreclose the sort of unintentional invalidation of the non-competition provision that could result from a constructive discharge. See EEOC v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1250-51 (11th Cir. 1997) (noting that a showing of employer willfulness is not required to establish a constructive discharge); see also Pittman v. Hattiesburg Mun. Separate Sch. Dist.,

---

[1] Paragraph 9(C) of the employment contract provided:

> C. Payments in the Event of Termination for Other than Cause.
>     If the Employee is terminated for reason other than cause, compensation payments shall continue for the remainder of the five (5) year Employment Period on the same basis as established in paragraph 4 hereof, including Base Salary, Incentive and Additional Incentive Compensation.

16

644 F.2d 1071, 1077 (5th Cir. May 1981) (stating that, to establish a constructive discharge, an employee does not need to prove that an employer subjectively intended to force the employee to resign); Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980) (noting that the conditions endured, rather than the employer's state of mind, are relevant to the constructive discharge inquiry). We therefore hold that an alleged constructive discharge would not constitute a "terminat[ion] by Employer without cause" so as to render null and void the non-competition provision of the employment contract.

2

Hinely next contends that he was not obligated to comply with the non-competition provision because Alliance Atlanta materially breached the employment contract by engaging in illegal price fixing, by depriving Hinely of his supervisory responsibility for the Texas office, and by failing to account fully for denying Hinely incentive compensation. In entering summary judgment for Alliance Atlanta on its breach of contract claim, the district court concluded that, even if Alliance Atlanta had materially breached the employment contract, the breach did not excuse Hinely's failure to comply with the non-competition provision because Hinely failed to give Alliance Atlanta the requisite notice and opportunity to cure the breach.

17

i

Hinely argues that Alliance Atlanta breached the employment contract before he did and that the company's antecedent breach excused him from any further performance under the contract, including adherence to the non-competition provision. If we were to so hold, we would effectively render meaningless contractual "notice and cure" requirements like the one included in the non-competition provision here. Hinely cites no Pennsylvania authority to support the adoption of such a rule, and we decline to do so. See Bethlehem Steel Corp. v. MATX, Inc., 703 A.2d 39, 42 (Pa. Super. 1997) ("A court may not disregard a provision in a contract if a reasonable meaning may be ascertained therefrom. In construing a contract, each and every part of it must be taken into consideration and given effect, if possible . . . .") (alterations, quotations, and citation omitted); see also In re Colony Square Co., 843 F.2d 479, 481 (11th Cir. 1988) (rejecting a litigant's claim of breach because that litigant failed to comply with a contractual "notice and cure" provision) (citing Orkin Exterminating Co. v. Stevens, 203 S.E.2d 587, 593 (Ga. App. 1973) ("The failure to give notice as required . . . is an independent bar to the maintenance of a successful cause of action on the contract.")).

ii

In Hinely's brief filed in opposition to Alliance Atlanta's motion for summary judgment, he conceded that he "did not inform Alliance Atlanta of their breach prior to October 2nd." On appeal, however, Hinely argues that he "effectively" gave Alliance Atlanta notice of the alleged material breaches well before he left Alliance Atlanta and started his competing venture. In support of this argument, Hinely contends (1) that Alliance Atlanta was aware of the price fixing investigation and his role in prompting it; (2) that a May 31, 1995, letter from Hinely's lawyer to Alliance Atlanta's lawyer notified them that the company was not in compliance with the employment contract because it failed to provide information relating to the denial of incentive compensation; and (3) that, on learning that he would no longer have supervisory responsibility for the Texas office, he orally informed Webb that he considered it a breach of his employment contract.

"When parties define the terms used in a contract, those definitions govern the construction of the contract." See Eannarino v. Eannarino, 439 A.2d 760, 761 (Pa. Super. 1982); see also Colony Square Co., 843 F.2d at 481 ("Contracts which set forth the manner in which a party must exercise a remedy in the event of a default must be strictly adhered to. . . . Accordingly, when a default clause contains a notice provision, it must be strictly followed . . . .") (citations omitted). Here, the

19

"General Provisions" section of the employment contract included the following

definition of the term "notice:"

> All notices, requests, and other communications to any party shall
> be in writing and sufficient if delivered personally, sent by
> registered or certified mail, postage prepaid, return receipt
> requested, or by nationally recognized overnight courier service,
> addressed as follows:
>
> If to the Employer, at:
> Alliance Metals, Inc. of Atlanta
> [address omitted]
>
> With a copy to:
> C. Barry Buckley, Esquire
> [address omitted]

Hinely failed to demonstrate that he sent written notice to Alliance Atlanta

and Buckley specifying a material breach and requiring it to be cured. The May

31, 1995, letter was addressed and sent only to Buckley and not to Alliance

Atlanta. That letter read:

> Pursuant to paragraph (5)(b) of the Employment Agreement between
> Alliance Metals and Robert F. Hinely, Jr., Alliance is to provide Robert
> Hinely with copies of all information and materials he requires to complete
> his review of Alliance's calculation of Incentive Compensation. Robert's
> accountant, Barry Franklin, has yet to receive any response to his February
> 9, 1995, request for information from Mr. Gerald G. Storch, Alliance's
> accountant, in connection with Robert's review of the calculation of
> Incentive Compensation. Additionally, I have not received any response to
> my phone calls and letters to you regarding this matter.
>
> I would greatly appreciate it if you would favor me with a response as to
> the status of this matter as soon as possible.

Even if the letter had been sent to Alliance Atlanta in addition to Buckley, it stops short of "specifying the breach and requiring it to be cured" as is necessary under the notice requirement of the non-competition provision. We conclude that Hinely failed to demonstrate that he gave notice of any of the alleged breaches sufficient to satisfy the requirement of notice as that term is defined in the employment contract.

iii

Hinely next argues that notice would have been futile and that he was therefore excused from complying with the notice requirement of the non-competition provision. Alliance Atlanta contends that Hinely did not raise the defense of futility before the district court and that this court should therefore decline to consider this defense.

Hinely's brief in opposition to the motion for summary judgment included the following argument:

> Alliance Atlanta argues that Hinely did not give Alliance Atlanta an opportunity to cure their breach. . . . <u>Even if Hinely was required to give Alliance Atlanta an opportunity to cure its breach, the damage resulting from the price-fixing had already occurred, making the breach "incurable" because damages could not have been mitigated at that point.</u> Regarding the breach resulting from the reduction of Hinely's employment duties, after Hinely sent his October 2nd [resignation] letter to Alliance Atlanta, Alliance Atlanta failed to notify Hinely that it planned to cure the breach by reinstating his Texas responsibilities. Consequently, with regard to both breaches,

21

> Alliance Atlanta's opportunity to cure was either not utilized by
> Alliance Atlanta or no logical cure was available.

(emphasis added). In his unsuccessful motion for reconsideration, Hinely asserted that "any notice [he] could have given to [Alliance Atlanta] would have been futile." Although the district court never squarely addressed Hinely's futility argument, we decline to deem it waived. See Damiano v. FDIC, 104 F.3d 328, 332-33 n.6 (11th Cir. 1997) (noting that waiver doctrine is a rule of practice the application of which is a matter of appellate court discretion).

The futility doctrine flows out of the principle that "the law does not require the performance of vain or useless things." Fishel v. Yorktowne Mut. Ins. Co., 385 A.2d 562, 565 (Pa. Super. 1978) (quoting Forester v. Teutonia Fire Ins. Co., 60 Pa. Super. 151 (1915)); see also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (noting that a party to a contract may be excused from complying with a notice requirement if notice would be a "useless gesture") (citing, among others, Craddock v. Greenhut Constr. Co., Inc., 423 F.2d 111, 115 (5th Cir. 1970)). On summary judgment, Hinely bore the burden of introducing evidence to support a reasonable finding that giving notice of the alleged breaches would have been useless. See Gey v. Beck, 568 A.2d 672, 680 (Pa. Super. 1990) (in a different context, stating that the party asserting futility bears the burden of proving it); Beattie v. Commonwealth Unemployment

22

Compensation Bd. of Review, 500 A.2d 496, 499 (Pa. Commw. 1985) (same); see also General American Life Ins. Co. v. AmSouth Bank, 100 F.3d 893, 901 (11th Cir. 1996) (noting that a litigant asserting a defense in opposition to summary judgment bears the burden of presenting evidence sufficient to establish that defense). The parties to this appeal agree that the futility of giving notice is an issue of fact. Both parties, however, urge this court to decide the issue as a matter of law in their respective favor.

In his brief filed in opposition to the motion for summary judgment and in his motion for reconsideration, Hinely failed to point to any evidence, or even argue, that notice would have been futile with respect to Alliance Atlanta's alleged failure to account fully for denying him any incentive compensation. Indeed, it was undisputed in the record before the district court that, when Hinely left Alliance Atlanta on October 2, 1995, he had not sought arbitration of his grievance as required by the incentive compensation provision of the employment contract. We conclude that Hinely failed to meet his burden of demonstrating that notice with respect to this alleged breach would have been useless.

With regard to the futility of notifying Alliance Atlanta that he deemed the deprivation of his supervisory responsibility for the Texas office a material breach, Hinely asserted in his opposition brief that "after [he] sent his October 2nd letter to

Alliance Atlanta, Alliance Atlanta failed to notify Hinely that it planned to cure the breach by reinstating his Texas responsibilities." The mere fact that Alliance Atlanta did not attempt to cure the deprivation of responsibility after Hinely had already left the company does not support a reasonable conclusion that Alliance Atlanta could not or would not have cured this alleged breach had it been formally confronted with the threat of liberating Hinely from his obligations under the non-competition provision. Moreover, the loss of supervisory responsibility of which Hinely complains appears, on its face, to be reversible and therefore curable. We conclude that Hinely failed to meet his burden of demonstrating that notice with respect to this alleged breach would have been useless.

Finally, with regard to the futility of notifying Alliance Atlanta that he deemed the company's price fixing a material breach, Hinely relies solely on the character of the alleged breach itself. He asserts that, once Alliance Atlanta entered into the price fixing conspiracy, there was no going back. Hinely's allegation would support a reasonable conclusion that giving notice would have been useless to Hinely. It would not, however, support the conclusion that receiving notice would have been useless to Alliance Atlanta. Cf. L.K. Comstock & Co. v. United Eng'rs & Constructors, Inc., 880 F.2d 219, 232 (9th Cir. 1989) (excusing contractor's failure to comply with a 48-hour "notice and cure"

24

provision before terminating subcontract because "for [the contractor] to give 48-hour notice would have been a <u>useless gesture in terms of any benefits to [the subcontractor</u>]") (emphasis added).

Here, even if the alleged breach proved to be incurable, the bargained-for requirement of notice the parties included in the non-competition provision served to prevent inadvertent invalidation of that provision by an unrecognized material breach. At a minimum, receiving notice would have given Alliance Atlanta thirty days to brace itself for Hinely's transition from compatriot to competitor. Depending on how early in the progression of events Hinely had given notice to Alliance Atlanta and its lawyer, receiving notice may even have induced Alliance Atlanta to abandon the price fixing conspiracy and minimize its exposure to criminal penalties and related consequences.

That Alliance Atlanta could have benefitted from notice alone distinguishes this case from many cases in which courts have excused a party's failure to comply with a "notice and cure" provision on the ground of futility. In those cases, the party seeking to enforce the provision typically disavowed any further performance under the contract prior to the time the other party should have given notice. <u>See, e.g.</u>, <u>Wolff & Munier, Inc.</u>, 946 F.2d at 1009 (affirming the district court's finding that "strict adherence to the . . . two-day cure provision would have been a 'useless

act' in the face of the [breaching party's] abandonment of the job and its unjustified ultimatums"); <u>Solitron Devices, Inc. v. Honeywell, Inc.</u>, 842 F.2d 274, 278 (11th Cir. 1988) ("By letter . . . Solitron itself expressly repudiated the subcontract. Once Solitron had itself terminated the contract, a cure notice from Honeywell would have served no purpose."); <u>United States v. Digital Prods. Corp.</u>, 624 F.2d 690, 694 (5th Cir. 1980) (where one party sent a telegram stating that it "hereby terminates all efforts on subject contract," holding that the other party was not obligated to follow the contractual requirement of notice and a ten-day curative period). In such circumstances, notice of the breach would be useless to the breacher, whose own conduct renders notice a redundant, empty formality.

Hinely failed to meet his burden of demonstrating that notifying Alliance Atlanta that he considered the company's price fixing a material breach would have been useless to Alliance Atlanta. The district court therefore did not err in failing to find a genuine issue of material fact as to whether he was excused from complying with the notice requirement of the non-competition provision.

## III

Hinely argues that the district court erred in concluding Alliance Atlanta was entitled to summary judgment on its claim of trademark infringement. To prevail on this claim, Alliance Atlanta had to establish (1) that it had a right to the

26

trade name at issue, Hinely Aluminum, Inc.; and (2) that the trade name Hinely adopted, Hinely Industries, Inc., was confusingly similar to that trade name, such that Hinely's use of the name created a likelihood of confusion among consumers as to the origin of goods sold.  See Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984).

## A

It is undisputed that Alliance Atlanta acquired the rights to the Hinely Aluminum, Inc., trade name when it acquired the assets of Hinely Aluminum, Inc., on March 22, 1994.  Hinely argues, however, that Alliance Atlanta lost its rights to the name when it breached the employment contract.  Hinely's argument rests on the theory that the asset purchase contract and the employment contract were part of one transaction, and that the breaches of the employment contract he alleges therefore also constituted breaches of the asset purchase contract.  Hinely further contends that perpetration of criminal conduct under the name of Hinely Aluminum, Inc., was a direct breach of the asset purchase contract.

If a contract involves clear and unambiguous terms, we "need only examine the writing itself to give effect to the parties' understanding."  Harrity v. Medical College of Pennsylvania Hosp., 653 A.2d 5, 10 (Pa. Super. 1994).  The asset purchase contract provided, in pertinent part:

27

1.1 <u>Purchase and Sale</u>.

   (a) The Seller shall sell, convey, transfer and assign to the Purchaser, and the Purchaser shall purchase from the Seller, on the Closing Date (as defined below), the Acquired Assets. "Acquired Assets" shall mean all of the following real property, personal property assets (tangible or intangible), and rights of the Seller used or held in connection with the Business . . .

      (i) all Seller's trade names, trademarks and service marks.

. . . .

1.4 <u>Closing</u>.

   The closing (the "Closing") for the consummation of the transactions contemplated by this Agreement shall take place . . . at 10:00a.m. (east coast time) on March 22, 1994 or such other date and time agreed to by the Seller and the Purchaser . . . .

1.5 <u>Instruments of Conveyance and Transfer</u>.

   At the Closing, the Seller shall deliver to the Purchaser such bills of sale, endorsements, assignments and other instruments of transfer, conveyance and assignment . . . as shall be necessary to transfer, convey and assign the Acquired Assets to the Purchaser.

Under the terms of the asset purchase contract, Alliance Atlanta fulfilled its contractual duties relating to the acquisition of the trade name Hinely Aluminum, Inc., at the closing that took place on March 22, 1994. Once Hinely sold the name to Alliance Atlanta, the company was free to use the name in any manner it deemed

fit. The district court did not err in finding there was no genuine issue of material fact as to Alliance Atlanta's rights to the trade name Hinely Aluminum, Inc.

B

Hinely also argues that the district court erred in deciding likelihood of confusion as a matter of law. In support of this argument, he first contends that likelihood of confusion is a jury question. Although likelihood of confusion generally is a question of fact, it may be decided as a matter of law. See Conagra, 743 F.2d at 1514-15. Indeed, this court has decided likelihood of confusion as a matter of law in the first instance. See id. at 1514.

The following factors are relevant in determining whether there is a likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion. See Conagra, 743 F.2d at 1514. The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion. See id. at 1514-15 (finding likelihood of confusion as a matter of law based on evidence of

misdirected inquiries from distributors, suppliers, prospective employees and customers, as well as misdirected billing invoices).

The district court did not err in finding that the evidence before it compelled the conclusion that there was a likelihood of confusion between the trade names Hinely Aluminum, Inc., and Hinely Industries, Inc. There was no dispute that the two marks are similar. It was also undisputed that both companies distribute prefinished aluminum sheets and sign blanks in the same territory. Most importantly, there was ample undisputed evidence before the district court of actual confusion.

Melissa Hough, Alliance Atlanta's controller, alleged in an affidavit that Alliance Atlanta received many payments from its former customers for goods those customers bought from Hinely Industries, Inc. Filed in support of Hough's affidavit were copies of more than a dozen checks Alliance Atlanta received for goods sold by Hinely Industries, Inc., that were made payable to "Hinely Aluminum." One such check was made payable to "Hinely Aluminum Industries Inc."

In her affidavit, Hough also alleged that Alliance Atlanta received invoices from vendors and creditors billing "Hinely Aluminum" for goods and services purchased by Hinely Industries, Inc. She attached copies of seven such invoices.

She also alleged that vendors delivered goods ordered by Alliance Atlanta to Hinely Industries, Inc., and vice versa. Additionally, Alliance Atlanta introduced the deposition testimony of aluminum buyers that demonstrated confusion. For example, when asked in a deposition whether he was "confused as to the difference between Hinely Industries and Hinely Aluminum and Alliance Metals, Inc. of Atlanta," aluminum buyer Robert Goldstucker replied, "[e]xtremely."

Hinely argues that, in finding likelihood of confusion as a matter of law, the district court failed to consider his explanation for the evidence of confusion. He alleges that Alliance Atlanta received mail intended for Hinely Industries, Inc., because of a forwarding order Alliance Atlanta placed with the United States Postal Service after the company's July 1995 relocation. This factual allegation does not raise a genuine issue of material fact when placed beside the extensive evidence of confusion introduced by Alliance Atlanta.

The numerous checks and invoices Alliance Atlanta received that were intended for Hinely Industries, Inc., were not simply misrouted; they referred to the wrong company, "Hinely Aluminum," by name. Furthermore, the misdirected deliveries Hough described came directly from vendors, not the United States Postal Service. Lastly, the forwarding order could not explain testimony of customers like Goldstucker reporting confusion as to the difference between

31

Hinely Industries, Inc., and Hinely Aluminum, Inc. The district court did not err in finding as a matter of law that there was a likelihood of confusion between Hinely Industries, Inc., and Hinely Aluminum, Inc.

IV

Hinely found himself in an unenviable position when he came to suspect his employer of unlawful anticompetitive activity. His decision to report his suspicions to the Department of Justice is to be commended. Neither the righteousness of that action nor the wrongfulness of Evans's and Alliance Metals, Inc.'s conduct, however, excuses Hinely's formation of a competing enterprise that violated both the non-competition provision of his employment contract and Alliance Atlanta's trademark rights. The judgment of the district court is **AFFIRMED**.