Mary CONWAY–JEPSEN, Plaintiff,

v.

SMALL BUSINESS ADMINISTRA-TION,[1] Hector Barreto, Administrator, U.S. Small Business Administration, Defendants.

No. CV 02–27–H–CCL.

United States District Court, D. Montana, Helena Division.

Feb. 17, 2004.

---

**1.** Pursuant to 42 U.S.C. § 2000e–16(c), the Small Business Administration is not a proper named defendant, and the SBA should be dismissed as a party. *See also Vinieratos v. United States Dept. of Air Force*, 939 F.2d 762, 772 (9th Cir.1991).

James G. Hunt, Hunt & Molloy, Helena, MT, for Plaintiff.

Lori A. Harper Suek, Office of the U.S. Attorney, Great Falls, MT, for Defendants.

*OPINION & ORDER*

LOVELL, Senior District Judge.

This is an action by a former federal employee for damages for retaliation and

wrongful constructive discharge. Its facts are unusual.

Plaintiff Mary Conway–Jepsen, an Assistant District Director for the Helena, Montana office of the United States Business Administration (the "Helena SBA") from December 26, 1993, to August 6, 1997, complains that she was retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereinafter, "Title VII"). Plaintiff Conway–Jepsen ("Conway–Jepsen") objected to what she believed to be gender discrimination by the female District Director against male employees in the Helena SBA. As a result of the retaliation, Conway–Jepsen claims she was constructively discharged and consequently suffered monetary and emotional damages.

The case came on regularly for a five-day trial before the undersigned sitting without a jury. Plaintiff was represented by James G. Hunt. Defendants were represented by Assistant United States Attorney Lori Harper Suek. Having received the evidence, reviewed a transcript of the testimony, considered the briefs, and heard the arguments presented by the parties, the Court is prepared to decide all issues in the case.

The following narrative opinion constitutes the Court's findings of fact, conclusions of law, discussion, verdict, and disposition of the case.

### *Facts*

Shortly after August, 1992, Jo Alice Mospan came to Helena, Montana, as the new District Director ("DD") of the Helena SBA. Earlier that year, beginning in April, Mospan spent four months in the Santa Ana, California SBA office as Acting DD, where Plaintiff Conway–Jepsen then worked as the Branch Chief of the Minority Enterprise Development Program ("MED").[2] Mospan and Conway–Jepsen met and had lunch on two occasions. TR 411:6. During one conversation, Conway–Jepsen told Mospan that she had recently purchased a retirement property in Montana, and that she would be interested in relocating to the Helena SBA. TR 661:4–12. During another conversation, Mospan told Conway–Jepsen that she had investigated the various SBA offices to find out who was going to retire as DD, and when. TR 411:15–19.

Mospan knew that the DD of the Helena SBA was retiring. TR 890:13–15. Mospan already knew John Cronholm, the DD in the Helena SBA, from having met him at various SBA conferences. TR 661:16–18. John Cronholm retired from the position of Helena DD sometime prior to August, 1992. Mospan received the appointment as DD in late August and came to Helena to assume that position sometime thereafter. *See* Pl.'s Ex. 4, p. 0006. When DD Cronholm retired in 1992, Mospan had spent approximately 18 months in SBA's District Director Candidate Training Program, and she was awaiting her first assignment to an SBA office as a DD. The Helena SBA office was the first DD position to open up when Mospan was ready to take a DD position. TR 329:3–4.

Toward the end of her four-month tour of duty as Acting DD in Santa Ana, Mospan told Conway–Jepsen that she (Mospan) was going to become the DD of the Helena SBA. TR 411:18–19. Mospan also told Conway–Jepsen that the Helena SBA "was full of white males and that she was going to do something about that." TR 412:4–6. Conway–Jepsen was somewhat surprised but basically unconcerned by

---

**2.** Conway–Jepsen's pay level was GS–13. She supervised a staff of 45 persons. TR 408:17–23.

this comment, because she assumed that Mospan intended to "do something about that" over time through the natural attrition of male employees. TR:412:14–18.

After completing her tour in the Santa Ana SBA on July 1, 1992, Mospan returned to the Washington, D.C., SBA headquarters. At the end of August, 1992, Mospan was officially notified that she had received the DD position at the Helena SBA. Mospan was then briefed by EEO personnel specialists in the composition of the Helena SBA staff. Through charts and statistics, Mospan learned that there were no females above a Grade 11 in the Helena SBA office and that most of the senior employees and supervisors were male. TR:665:25–666:17.

When Mospan arrived at the Helena SBA, she established herself immediately as a tough DD by disciplining almost half of the employees (male and female) for improper use of SBA funds to defray some of the costs of a retirement party for DD John Cronholm. TR 677:13–18; 678:2–17.

Mospan continued to mete out discipline frequently to SBA employees, but particularly to certain male SBA employees. Mospan's everyday conversation with her employees often contained profanity, and she liberally utilized the "f" word apparently for emphasis. She raised her voice frequently, yelling at employees who displeased her, and she could be heard all around the office. She was described, in today's parlance, as an "in your face" type micro-manager.

Mospan immediately began to systematically harass the Branch Chief of the Business Development program, Jerry Christison, a 25–year career SBA employee who had always received excellent to superior job evaluations. Christison had applied for the DD position that opened in 1992, as well as Mospan, but he didn't really expect to receive it. TR 115:4–11. Christison knew that Ron Zeiler was DD John Cron-

holm's "pick" for his successor. TR 115:23–116:1.

When Mospan arrived, Christison supervised Byron Roberts and Michelle Johnston, who had begun her tenure with the SBA as a Grade 9 office assistant. Mospan gave Johnston the title "Native American Coordinator," and some of Christison's responsibilities. Soon Johnston began to send memos to Christison telling him what work she would perform and what her work schedule would be. TR 75:15–18.

In 1993, Mospan began recruiting Nora Walsh from SBA headquarters. TR 329:15–330:10. Before Walsh arrived at the Helena, SBA, she attended a Leesburg, Virginia, District Director's meeting with Mospan. TR 330:13–17. In her motel room, Mospan showed Walsh the roster of employees and the reporting structure, and Mospan told Walsh about things she wanted to change. TR 330:21–331:1. Mospan told Walsh that "there were too many men supervisors and that [was] one of the reasons she was bringing me in was to—I looked at it as a diversity issue. She complained about . . . the old boy's network." TR 331:17–21. Indeed, Mospan wanted Walsh to come to Helena SBA for the express purpose of harassing and ultimately firing certain male career SBA employees, including Jerry Christison and Byron Roberts, so that they could be replaced by females.

After Walsh arrived in Helena in August, 1994, Mospan showed Walsh a hit list of the male employees Mospan intended to fire:

A. . . . I found out the real reason I was brought out, which I didn't know upfront. And she wanted me—I mean, point-blank told me she wanted me to fire Jerry, make his life miserable, and because I knew how to do it, I had the personnel experience and she wanted me—she had—I don't think she called it

a hit list—I would call it that—but she gave me, "These are the people and they need to go." So that's how it went.

Q. Who was on the list?

A. It was Jerry, Ron, Byron, Jack. David was sort of like a question mark. She said he was like—she could go either way with David. I think there was a Don. There were some other guys. I don't remember their names. They were loan officers and she said she wanted them gone.

Q. During these conversations, did she make any comments about males?

A. There were too many men and—well, she didn't like them. She said that they gave her a hard time and didn't respect her and her position. And she wanted—she didn't want them around.

TR 334:10–335:6.

All of these men were long-time career SBA employees with good work records, ratings, and performance histories. When Mospan arrived in 1992, the top layer of supervisors and program directors in the Helena SBA office was male: Ron Zeiler (ADD Finance and Investment), Jack Carpenter (Chief, Liquidation Branch), Roger Nordahl (Minority Enterprise Development), Jerry Christison (Chief, Business Assistance/Servicing Branch), David Davidson (Chief, Finance Branch, and later ADD Finance and Investment). When Mospan left in 2000, none of these men was employed by the SBA. Ron Zeiler retired in December, 1995, Jack Carpenter and Jerry Christison took early retirement in 1995, Roger Nordahl retired in 1994, and David Davidson took early retirement in 1997. Jerry Christison, the Business Development Director, was replaced by Michelle Johnston, who had once been his office assistant. TR 117:5–9; 308:4–11.

When Walsh arrived in 1994, she was given the title of Deputy Assistant District Director for Economic Development, a position that did not exist prior thereto. TR: 376: 2–8. Shortly after her arrival, Walsh realized that her job was to fire Jerry Christison and Byron Roberts. Mospan telephoned Walsh regularly at home, urging her to move more quickly. TR 336:14–23. The gist of these conversations was that

I was moving too slowly, that she wanted Jerry out. And I'm being too nice, I'm being too kind. And I kept telling her the problem was Jerry was improving.

I mean every time I gave Jerry corrections, he corrected. So it was getting pretty frustrating.

TR: 336:22–337:3. As Walsh began to like and respect Jerry Christison and Byron Roberts, she became a disappointment to Mospan. TR 341:6–15. Walsh angered Mospan by pulling a letter of reprimand from Byron Roberts' personnel file. TR 343:10–11. Eventually Walsh refused to issue reprimands to Christison and Roberts. TR 345:1–2. Walsh testified that the root of her conflict with Mospan was

I wouldn't do what she wanted me to do, which was fire Jerry and Byron. I mean, it's very black and white. I know why.

TR: 356:22–24. Finally, Walsh wanted out, and she told Mospan that she should be allowed to return quietly to SBA headquarters. TR 352:21–353:2. Instead, Mospan began a campaign of retaliation against Walsh. TR 353:3–6. Mospan pulled strings to have Walsh reassigned to an unfavorable position in the Fresno, California SBA office. TR 386:21–387:8.

In 1993, Mospan also recruited Conway–Jepsen. Mospan telephoned Conway–Jepsen, notified her of an upcoming vacancy in the Helena SBA office, and invited her to apply for the position. TR 662:8–13. This Conway–Jepsen did, and after she was hired for the position she moved to Helena at the end of 1993. For the next year,

Conway–Jepsen and Mospan had mutually-satisfactory relations, and Mospan was satisfied with Conway–Jepsen's job performance. TR 881:2–14.

In the Fall of 1994, however, Conway–Jepsen spent less time traveling, and more time in the Helena SBA office, where she worked occasionally with Christison. TR 430:20–22. Conway–Jepsen found Christison to be a good worker with good ideas, easy to work with, and well liked by others. TR 430:22–431:2. It dawned on Conway–Jepsen that the promotion of women by Mospan would be "on the backs of the guys. . . ." TR 432:25. Conway–Jepsen testified that she had "realized that what [Mospan] was doing was not, you know, equality. She was going after [Christison] because he was a white guy that was in the way so that she could put Michelle in there. And, you know, that's wrong." TR 431:14–17.

Conway–Jepsen wanted to fix this situation, so she started by telling Mospan that Christison was not so bad. TR 433:9. Eventually, Conway–Jepsen told Mospan that what she was doing to Christison was wrong. TR 433:13–16. In response, Mospan became angry with Conway–Jepsen. TR 433:15–16. Conway–Jepsen's travel mileage reimbursement was cut in half. TR 435:20–436:8. Comp time was taken away. TR 436:18–20. Conway–Jepsen was forced by Mospan to take annual leave for being a few minutes late. TR 510:3–5.

Conway–Jepsen also objected to Mospan's harassment of Byron Roberts. When Conway–Jepsen heard Mospan and Michelle Johnston demeaning Byron Roberts, Conway–Jepsen told Mospan that "as a manager I found that it's much easier to work with an employee than to try to fire him. . . . Byron has got a lot going for him." TR 508:5–8. In response, Mospan and Johnston rolled their eyes. TR 508:11. Conway–Jepsen defended Byron in this way, even though she "knew that

every time [she] said something that [Mospan] was going to punish me. . . ." TR 508:14–16.

In December, 1994, Mospan called Conway–Jepsen and Michelle Johnston into her office, and outlined a plan to set Christison up for failure. TR 438:1–6. Mospan told Conway–Jepsen and Johnston that the three of them would attend a meeting with Christison to discuss organizing an SBA conference on Native American issues, but that none of the women would speak, leaving Christison to flounder. TR:438:1–8. One or two other SBA employees were present. TR 438:13–17. Because Michelle Johnston was the Native American Coordinator, she should have been the person responsible for organizing the conference. TR 437:24–25.

For about ten minutes, Christison, apparently unaware that he was supposed to organize the conference, struggled to discuss the upcoming conference without any participation from any other person at the meeting. TR: 17–20. Conway–Jepsen could not tolerate the situation, and she left the meeting. TR 438:22–23. Michelle Johnston, a defense witness, testified that she found Conway–Jepsen in tears after the meeting. TR 1030:1–13. From that day forward, Mospan had it in for Conway–Jepsen. TR 439:8–10. Christison noticed the change, and he testified:

[Mospan] was going around the office saying, "Where is that Mary Conway, where is she now, what is she doing, did she come back?" Before that she had a free reign [sic] to go where she wanted to go, do what she wanted to do, take a leave when she wanted to, call in after she'd taken leave and tell [Mospan] she'd taken leave. I was never allowed to do any of that. TR 127:13–20.

[A]ll of a sudden [Mospan] was questioning everything [Conway–Jepsen] did and she was questioning it in front of the

other supervisors, "Where is Mary, what is she doing, why isn't she here, why isn't she there?" TR 134:13–17.

But Christison had his own troubles. In late 1994 or early 1995, while Christison was on vacation, Mospan gave Christison's office to Nora Walsh. TR 100:10–11. Christison's belongings were thrown haphazardly into boxes and moved into the hallway, much to his surprise upon his return from vacation. TR 100:4–17. Christison was permanently reassigned to a cubicle. TR 100:12–17.

Due to the extensive harassment Christison received from Mospan, Christison experienced continual stress, he began to have anxiety attacks, and his personal physician recommended that he retire. TR 21:16–21. Finally, in early 1995, when Mospan telephoned him at home one evening, Christison accepted Mospan's "offer" of an early retirement.[3] TR 94:6–25. Christison viewed this "offer" as a threat that he would be fired if he did not accept it. TR 94:18–95:12.

Mospan's harassment of Conway–Jepsen ranged from forcing her to resubmit leave requests innumerable times for petty reasons, TR 500:18–504:1, to shutting down the computer system at 5:00 pm so that Conway–Jepsen and Byron Roberts could not keep up with an overload of work, TR 469:15–470:5, 591:1–5. Plaintiff was inundated with a barrage of emails, TR 466:2–3, and program-irrelevant work assignments. For example, Mospan gave Conway–Jepsen and Roberts 10 days to prepare a year-long office business plan for the Helena SBA, an assignment well outside Conway–Jepsen's MED program duties, and then—only one day before the deadline—Mospan provided Conway–Jepsen with a detailed packet of business plan

guidelines from the SBA regional division. TR 470:12–471:19.

Many of Mospan's actions were petty, but some were more serious. An example of petty conduct is when Mospan reviewed Plaintiff's out-going letters for one month and criticized Plaintiff for four clerical-type errors. TR 487:15–489:20. More seriously, at times Mospan actively worked against Plaintiff's efforts in the MED program by taking counter-productive actions in Plaintiff's projects (e.g., the Scott Long Construction project, TR 473:19–474:23, the Looking Eagle Manufacturing flag project, TR 490:17–494:5, and the Sun Labs project, TR 592:15–593:18). Mospan focused obsessively on Plaintiff's leave requests and travel paperwork, insisting that Plaintiff's requests and paperwork be resubmitted again and again, and even changing a leave slip after Plaintiff had signed it. TR 504:6–505:25. Mospan put Plaintiff on AWOL status for leaving a Billings, Montana, conference fifteen minutes after the time it was supposed to have adjourned (the conference ran approximately two hours over) in order to drive 4 hours back to Helena to make a 5:00 p.m. appointment. TR 525:23–528:24.

Sometimes Mospan set Plaintiff up to make a mistake (e.g., the incident wherein Plaintiff provided feedback to two women who proposed a reservation training project), and then Mospan yelled at Plaintiff for making the mistake. When Plaintiff tried to correct her "mistake," Mospan yelled at Plaintiff for the manner in which she corrected her "mistake." TR 530:21–533:23. Mospan screamed and swore at Plaintiff to the point that Plaintiff was afraid to set foot in Mospan's office. TR 535:15–536:9.

---

**3.** Eighteen months after Christison left, Mospan promoted Johnston to supervisor of the only other Business Development specialist. After Plaintiff resigned, Johnston was appointed Acting Assistant DD for the Minority Enterprise Program. Five years after Christison resigned, Johnston became the new DD.

Mospan criticized Plaintiff for following procedures (e.g., the request for nominations for Native American Small Business of the Year) that had been acceptable to Mospan in previous years (or previous months, weeks, or days). TR 568:2–569:21. Mospan physically intimidated Plaintiff, yelled at her, and shook her finger in Plaintiff's face. TR 569:8–13; 595:11–13. Mospan falsely manufactured a negative performance review after the fact. *See* Exhibit 52; TR 585:24–587:2. The Court accepts Plaintiff's allegation that the last straw for her was finding that her contracting files had been rifled and that a document had been removed from the personnel file she kept in her office, leading Plaintiff to fear that she might be framed for some sort of illegal contracting activity. TR 577:6–578:23.

Even at that time, Plaintiff recognized that she had become paranoid and that her fears were out of control in this hostile work environment. TR 577:2. Plaintiff began to suffer from the stress of Mospan's harassment. TR 598:24–599:3. She could not sleep; she had headaches; she felt depressed. TR 520:19–23. She eventually sought help from her physician, who put her on an antidepressant and eventually recommended that she quit her job. TR 517:2–518:13. The Court accepts Plaintiff's conclusion that at the point of her resignation in August, 1997, the personal price of maintaining her job had become too high, and she had no choice but to resign.

A few months before Plaintiff did resign, however, she sent numerous memoranda to Tom Redder, SBA Regional Administrator, and to Ken Stram, SBA Associate Administrator of Field Operations, requesting that she be transferred to another SBA office or program. *See* Exhibit 50. Notably, neither Redder nor Stram responded to Plaintiff's request for a transfer, either directly or indirectly.

This continuous pattern of retaliatory treatment spanned a period of approximately two and one-half years. No reasonable employee could be expected to put up with Mospan's harassment for a longer period of time. In fear for her physical and mental health, Plaintiff resigned.

Plaintiff's perception of the intolerable nature of her working conditions was objectively reasonable. Plaintiff is an intelligent, knowledgeable, and aggressive program manager who supervised a staff of 45 persons before arriving at the Helena SBA. Plaintiff was authorized to enter into government contracts in an aggregate amount of $50 million dollars. Plaintiff's demeanor is that of a tough fighter, not a person who would easily wilt under pressure.

Significantly, Nora Walsh Salgado went through the same process of discovering that the men she was brought in to fire were actually responsible employees who did not deserve to be targeted for abuse, harassment, and elimination. TR 335:16–336:4; 338:19–341:9. Both Conway–Jepsen and Walsh then realized that Mospan's agenda was improper gender discrimination. Both resisted Mospan's agenda and communicated their objections to Mospan. Mospan retaliated against both Walsh and Conway–Jepsen.

### Law

■ Title VII prohibits an employer from discriminating against any employee because he or she has "opposed ... an unlawful employment practice...." 42 U.S.C.2000e–3(a). In order to prove retaliation, Plaintiff must show that (1) she opposed an unlawful employment practice, (2) she suffered an adverse employment action, and (3) a causal connection existed between the adverse employment action and the protected activity or opposition. *Passantino v. Johnson and Johnson*, 212 F.3d 493, 506 (9th Cir.2000). Plaintiff

need only show that her belief that there was an unlawful employment practice was reasonable. *See, Trent v. Valley Electric Ass'n Inc.,* 41 F.3d 524 (9th Cir.1994).

■ Among the unlawful employment practices forbidden by Title VII, is the rule that employers must not "... discharge any individual, or otherwise ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). This rule of nondiscrimination applies to employees of the federal government. 42 U.S.C. § 2000e–16(a).

A Title VII defendant may defend by showing that he or she had a legitimate, nonretaliatory reason for the conduct, and then the plaintiff must be able to show that these legitimate reasons are mere prextext for retaliation. *See, Stegall v. Citadel Broadcasting Co.,* 350 F.3d 1061, 1065 (9th Cir.2004) (*citing Manatt v. Bank of Am., N.A.,* 339 F.3d 792, 800 (9th Cir.2003)).

■ In order to meet her burden of proving that she was constructively discharged, Plaintiff must show that a reasonable person in her position would have felt compelled to resign because of intolerable working conditions. *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110 (9th Cir.1998); *Sanchez v. City of Santa Ana,* 915 F.2d 424, 431 (9th Cir.1990). A single isolated incident is usually insufficient to prove constructive discharge. *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987); *but see, Little v. Windermere Relocation, Inc.,* 301 F.3d 958 (9th Cir.2002) (single incident of rape may prove hostile work environment). Plaintiff must show some " 'aggravating factors' such as a 'continuous pattern of discriminatory treatment.' " *Sanchez,* 915 F.2d at 431 (*quoting Satterwhite v. Smith,* 744 F.2d 1380, 1382 (9th Cir.1984)).

In addition, Plaintiff must show that the intolerable working conditions were created by the very conduct that constituted a violation of Title VII (in this case, e.g., the retaliation) and that her resignation resulted from the intolerable working conditions. *See Lawson v. Washington,* 296 F.3d 799, 805 (9th Cir.2002).

### Discussion

Jo Alice Mospan took the witness stand and told an entirely different story than that testified to by Plaintiff. Mospan testified that she never targeted males for harassment and that any employee who received criticism from her had earned it by poor performance. Essentially, Mospan denied every significant allegation made by Plaintiff, Nora Walsh Salgado, Jerry Christison, and Byron Roberts.

This would be a close case if all the testimony of Mospan were considered true and correct and the testimony of Plaintiff's supporting witnesses were discounted. However, the testimony is in sharp and direct conflict, and the Court must determine who has testified falsely and where the truth is.

In approaching this determination, the Court has in mind its customary jury instructions given regularly over the past 18 years, i.e.:

> In weighing the testimony of a witness to determine if he or she is telling the truth, you should ask yourself the following questions:
>
> 1. What is the interest of the witness in the result of this case? How might the witness be affected by the verdict?
>
> 2. What is the intelligence of the witness?
>
> 3. Is his or her testimony supported or contradicted by the other evidence in the case?

4. Has the witness been self-contradictory on the witness stand?

5. Has the witness made statements at other times inconsistent with his or her testimony here?

A witness who is willfully false on a material point is to be distrusted, and you may reject the testimony of such a witness or give it such weight as you believe that it deserves.

A witness may be impeached, that is, discredited, by evidence that at some previous time the witness has said or done something inconsistent with his or her testimony in court.

If you believe that a witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you think it deserves.

The Court carefully observed the demeanor of Mospan as she testified and has reviewed and reconsidered that testimony since. In examining the testimony of Mospan, the Court found numerous problems and discrepancies. Three of these are worthy of mention and emphasis. First, Mospan testified that on the day Roberts delivered his resignation letter (April 15, 1998), he told her that he was resigning because he wasn't happy doing some of the work he was then doing at SBA and because he did not like all the regulations and rules he had to follow as a federal employee. TR 749:1–17. Mospan testified that she did not think Byron Roberts was upset. TR 749:18–25. The inference here was supposed to support Mospan's position that Roberts was not discriminated against because he didn't think he had been and had left for another reason. Thus, it is a material point.

However, Roberts testified that Mospan knew how extremely dissatisfied he was when he left, because he told her so, and he had also told her about his dissatisfaction prior to handing in his resignation letter. TR 142:14–17. Contrast Mospan's testimony with the federal form that Roberts filled out after resigning, in which Roberts expressed vehement dissatisfaction by stating his reasons for leaving employment with the Helena SBA:

Inability to continue my career with SBA in light of intolerable working conditions brought about by the abusive management of Jo Alice Mospan, the current Montana SBA District Director. She has created a hostile work environment, pitting employee against employee, and creating divisiveness among staff. I and others have been subjected to continual verbal abuse and intimidation an [sic] front of supervisors and staff. I and others have been subjected to negative personnel actions, letters of reprimand and threatened suspensions in response to contrived and trivial matters. I and others have been subjected to sexual discrimination in promotions travel and achievement awards. She has denied my civil rights to participate in outside benevolent and community activities and organizations. For these reasons and in order to protect my physical and mental well being I felt compelled to resign and seek other employment.

Pl.Ex. 103, BS 00372. Mospan continued to maintain that she did not have the perception that Byron Roberts was upset when he tendered his resignation. Roberts was a 57–year old seasoned executive who had previously served as the Economic Development Director for the State of Montana Department of Commerce. When he resigned his SBA employment, he had already accepted a position as the executive director of the Montana Building Industry Association. Roberts testified at trial that he was certain Mospan knew that he was leaving under negative circumstances, TR 236:2–7, and the Court accepts Roberts' testimony, finding the testimony

of Mospan on this material point to be preposterous.

Second, Mospan testified that Jerry Christison once made an inappropriate comment to SCORE volunteer Nancy Rae and that Nancy Rae had come to Mospan crying because she was so upset by Christison's comment. TR 832:24–833:1; 833:9–14. Mospan testified that she recalled having confronted Christison about his misbehavior and that Christison had admitted making the comment. TR 833:19–24. However, Nancy Rae testified on rebuttal that the incident occurred during the tenure of the previous district director, not during Mospan's tenure. Nancy Rae testified that she was not upset by the incident and that she had never discussed it with Mospan. TR 1002:2–1003:7. Nancy Rae's testimony is corroborated by defense witness Michelle Johnston, who also remembered the incident as having occurred during the period when John Cronholm was DD, before Mospan arrived in Helena. Nancy Rae's testimony was credible and undermines the credibility of Mospan, who apparently remembers with vivid detail or fabricated an incident that never occurred (Nancy Rae crying in Mospan's office).

Third, Mospan testified that Nora Walsh was not recruited, was not her friend, and certainly was not recruited to fire male employees. Mospan testified that Walsh is a liar and an abysmal SBA employee who was foisted upon Mospan (against Mospan's better judgment) by the Washington, DC, SBA personnel office (Carolyn Smith and Caroline Chapel). Yet Mospan never produced either Carolyn Smith or Caroline Chapel, or any other evidence, to corroborate this story discrediting Walsh. Somewhat to the contrary, Mospan's own protege, defense witness Michelle Johnston, testified that Mospan had announced in a staff meeting that her *friend,* Nora Walsh, would soon be joining the Helena SBA staff. TR 1056:13–18. Certainly this is not evidence of the arrival of a stranger—a pariah—reluctantly received. Clearly Walsh was Mospan's eagerly-awaited *friend* and confidante recruited by Mospan to help carry out her improper agenda. Consider also Exhibit 108, a memo in which Mospan urges Walsh to accelerate her move date to arrive in Helena as quickly as possible, closing her memo with a promise to telephone Walsh at home, as previously planned.

When Walsh wanted to get out of the Helena SBA office, she asked for help from Carolyn Smith in SBA headquarters. TR 386:13–22. Note that Walsh sent an email to Carolyn Smith at SBA headquarters, reminding Smith that Walsh had left her new home and family in Washington, D.C., because Mospan in recruiting her had promised training that would prepare Walsh for a DD position. Walsh complains that she had disrupted her personal and professional life to come to the Helena SBA on the strength of Mospan's promises—a "verbal contract"—which Mospan had done nothing to fulfill but instead had *given Walsh the job of firing Christison and Roberts.* Walsh asks Carolyn Smith to be allowed to leave *"this unhealthy work environment"* and to be given a suitable position. *See* Walsh Dep., Ex. 6 (admitted by stipulation of the parties, TR 322:4–323:22).

This memo clearly establishes that Mospan recruited Walsh and promised to groom her for the position of DD, but equally important also emphasizes the fact that Carolyn Smith ("head of personnel" TR 350:13) was aware of Mospan's "verbal contract" with Walsh and the surrounding circumstances. Defendant's failure and omission to present evidence contrary to Walsh's assertion in Dep. Ex. 6, if such exists, is significant.

The testimony of Michelle Johnston and Exhibit 108 and Dep. Ex. 6, taken togeth-

er, impart credibility and corroboration to Walsh's testimony, and the Court cannot believe Mospan's testimony on this critical point. Mospan's attempt to discredit the devastating testimony of Walsh fails completely.

In deciding this case I have considered all the evidence and all the testimony of all the witnesses. There was testimony from SBA employees which was partially favorable to Defendant. Defense counsel argues strenuously that this testimony is entirely impartial and therefore should be accorded great, even controlling, weight. The Court addresses this contention because this is not entirely the pristine and disinterested testimony it is represented to be.

The Court notes first that these witnesses have all benefited in one way or another and to one degree or another from Mospan's reign. Consider, for example, Michelle Johnston. When Christison's head rolled, Johnston got his job. When Plaintiff's head rolled, Johnston got Plaintiff's job. Finally, Johnston became director of the entire operation. How could she do anything other than support these policies of which she is the pre-eminent beneficiary? The same is applicable to a lesser extent to the other defense witnesses.

Some of these witnesses were reticent and seemed to feel slightly defensive or exposed, uncomfortable lest there be a suggestion of complicity with Mospan or of having observed but ignored Mospan's conduct.

The Court notes that these individuals are dependent upon Defendant for their livelihood and retirement. Too, they have observed what happened to Christison, Roberts, Plaintiff, Walsh, and the other former employees. And they have a natural tendency to support their agency and their government.

It is understandable to the Court that these witnesses were uncomfortable and that they testified as they did. The Court makes no criticism of these employee-witnesses and has considered their testimony and given it the weight it deserves. Their testimony, however, does not detract measurably from the overwhelming case presented by Plaintiff's witnesses.

After examining the demeanor of all the witnesses and weighing the credibility of their testimony, the Court concludes that Mospan's testimony is to be discredited and is unbelievable. The Court specifically finds the testimony of Christison, Roberts, Walsh, and Plaintiff to be credible and accepts the same as reliable.

### Conclusions

The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331 and 1343(a). Venue lies in the Helena Division of the District of Montana pursuant to 28 U.S.C. § 1391(e). Plaintiff has exhausted her administrative remedies and has timely appealed a May 30, 2002, final agency decision.

■ The Court concludes that Plaintiff has made out a clear case of retaliation within the meaning set forth in Title VII, 42 U.S.C. § 2000e–3(a). The Court concludes that Mospan's alleged legitimate reasons for her treatment of Plaintiff are mere pretext for retaliation. Mospan was hostile to and retaliated against Plaintiff, who objected to Mospan's mistreatment of these male employees in violation of Title VII.

At all pertinent times herein, Mospan was the duly appointed and acting agent and DD of Helena SBA, acting within the scope and course of her authority and employment so to act, and Defendant is answerable for actionable wrongs committed by his agent Mospan against Plaintiff in violation of Title VII. Defendant knew or

should have known of the hostile working conditions at Helena SBA, yet failed to prevent or remedy these conditions.

Throughout her employment, Plaintiff continued to be motivated to work for the SBA in order both to earn a livelihood and also to serve the SBA. The Court can find no persuasive evidence that Plaintiff lost "the normal motivation of competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) (*quoting Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1026 (1994)). Instead, the Court concludes that Plaintiff reasonably found her hostile working conditions intolerable, that the intolerable working conditions were created by conduct that constituted a violation of Title VII, and that Plaintiff's resignation resulted from the hostile and intolerable working conditions. The Court concludes that Plaintiff was a diligent and competent SBA employee who was constructively discharged from her position by Mospan's lengthy, continuous, and pervasive pattern of retaliatory treatment for the reason that she had objected to employment practices which were unlawful under Title VII.

The Plaintiff cannot prevail just because some believed Mospan may have been a disagreeable individual or a micro-manager or even a bad manager. Plaintiff does prevail, however, because Mospan's conduct was motivated by discriminatory animus, Plaintiff recognized it for what it was, Plaintiff objected, and as a result Mospan retaliated against Plaintiff and constructively discharged her.

### Damages

Due to her present age (58) and her inability to obtain consulting work (both because of Mospan's interference and because Plaintiff was restricted by federal regulations from performing certain types of consulting work), Plaintiff believes that Mospan ruined her career, and the Court views this belief as justifiable under all the circumstances. The Court finds, however, that Plaintiff did make a good faith attempt to obtain employment after her resignation in August, 1998. Through no fault of her own, Plaintiff has been unable to obtain substantially similar employment. The Court finds that Mospan continued to retaliate against Plaintiff after Plaintiff's resignation by interfering with Plaintiff's ability to obtain consulting work in Montana. Plaintiff's mental and emotional suffering due to Mospan's retaliation further reduced Plaintiff's ability to obtain consulting work. The Court therefore finds that Plaintiff exercised reasonable diligence to mitigate her damages.

When Plaintiff resigned in August, 1997, Plaintiff's position was graded at the top step of GS–12. However, Plaintiff testified that Mospan had promised her that she would be returned to a grade GS–13, which was the grade she held while working in the Santa Ana SBA before coming to the Helena SBA, and Plaintiff asks that the Court honor that promise. TR 605:23–606:15. Plaintiff also testified that she had intended to work until age 62. TR 606:16–18. Therefore, Plaintiff requests $433,161 in backpay, which takes into consideration $123,126 in mitigation earnings, as of December 31, 2003. The Court accepts Plaintiff's testimony and that of her expert witness, David K. Johnson, and finds that Plaintiff's damages include loss of backpay in the amount of $433,161.

Although front pay is available under Title VII, reinstatement "is the preferred remedy...." *Cassino v. Reichhold*

*Chems., Inc.,* 817 F.2d 1338, 1346 (9th Cir.1987). In this case, it seems to the Court not impossible to reinstate Plaintiff, given that Plaintiff has four years remaining in her planned work-life, Plaintiff possesses skills of significant value to the SBA, and Plaintiff lives in an area where she can commute to large SBA offices where her skills can be utilized. Given these circumstances, the Court finds that Plaintiff should be reinstated by SBA in a Minority Enterprise Development/8(a) contracting position at a grade GS–13. In order to be made whole, Plaintiff must also be credited with the lost years of service for purposes of calculating her retirement and other benefits.

 A court may combine front pay with an order of reinstatement, as long as the court avoids duplication. *See Selgas v. American Airlines,* 104 F.3d 9 (1st Cir. 1997). Until Plaintiff's reinstatement, Plaintiff should receive front pay at a grade GS–13 salary level.

The Court has carefully considered Plaintiff's testimony and that of her spouse regarding Plaintiff's emotional pain and suffering resulting from Mospan's retaliation. The Court finds that Plaintiff suffered considerably while working at the Helena SBA during 1996 and 1997 and for a short period following her resignation, but Plaintiff's suffering is past and Plaintiff is now able to enjoy her life.

### Verdict and Order

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff has proven the allegations of her Complaint by a preponderance of the evidence and more, and the Court's verdict is for Plaintiff and against Defendant. The Clerk shall enter Judgment in favor of the Plaintiff against Defendant Hector Barreto as follows:

1. Defendant Hector Barreto shall pay to Plaintiff back pay as of December 31, 2003, in the amount of $433,161 plus interest to be calculated as of the date of this award;

2. Defendant Hector Barreto shall reinstate Plaintiff in a non-hostile work environment at the current salary level of GS–13 and shall give Plaintiff retroactive credit (to August 5, 1997) for the lost years of service for purposes of calculating Plaintiff's retirement benefits. Until Plaintiff is formally reinstated, the SBA shall pay to Plaintiff front pay (GS–13) beginning January 1, 2004, and continuing through December 15, 2007.

3. Defendant Hector Barreto shall pay to Plaintiff $50,000 in compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

4. Defendant Hector Barreto shall pay Plaintiff's reasonable attorney's fee to be determined by the Court as part of Plaintiff's costs of suit pursuant to 42 U.S.C. § 2000e–5(k).

IT IS FURTHER ORDERED that Plaintiff's Complaint is DISMISSED as to the Defendant Small Business Administration.